Whitaker, Judge,
delivered the opinion of the court:
Plaintiff brought this suit on behalf of its subcontractor, the R & R Contracting Company, for damages alleged to have been sustained by reason of the subcontractor’s having encountered unknown physical conditions at the site of the work.
The United States Coast Guard issued invitations for bids on the construction of a wharf and for dredging at Montauk Lifeboat Station, located on the northern tip of Star Island in Lake Montauk Harbor, which is a few miles from Mon-tauk Point, the easternmost extremity of Long Island, New York. On June 11, 1957, plaintiff, as lowest responsible bidder, was awarded the contract for a consideration of $38,450, which amount was increased to $46,340 by subsequent change orders 1 and 3, neither of which is involved here.
The specifications required the construction of a wood pier, 234 feet long by 7 feet wide, supported by 54 wooden piles to be driven to a depth of 25 feet minimum penetration. The specifications further provided for dredging to a depth of minus 10 feet below mean low water in an area specified in an attached Coast Guard drawing, which reflected approximate elevation and sounding data but did not refer to subsoil conditions. Neither the contract nor the specifications referred to the nature of the subsoil conditions, but paragraph 1-03 of the specifications provided:
Bidders shall visit the site to familiarize themselves with the actual conditions. Failure to do so shall in no way relieve the successful bidder of his responsibility to perform the specified work.
Paragraph 2-03 of the specifications, relating to dredging requirements, also provided:
*412 Removal of Debris amé Obstructions: All debris and obstructions, either natural or artificial, in way of the proposed work or in the channel to be dredged shall be removed to the depth indicated.
And paragraph 2 of the Instructions to Bidders provided :
Conditions at Site of Work. Bidders should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being-performed thereon.
Pursuant to these instructions and prior to the submission of its bid, Mr. Oscar Grand, plaintiff’s vice president, and Mr. Lucches Bivara, a partner of the subcontractor, visited the site on two different occasions. Their visual inspection of the area above the low-water mark showed the surface was composed predominantly of sand and gravel. They observed a few large boulders and some accumulation of smaller rocks and cobblestones. They talked with an officer in charge of the Coast Guard Station, who had no personal knowledge or records as to the subsurface conditions in the area to be dredged, but who drew their attention to a spoil area in the rear of the station which he understood was composed of material from a previous dredging operation in Lake Mon-tauk. The record is silent as to the exact origin of this material. It consisted of sand and gravel with a small amount of clay. Mr. Grand and Mr. Bivara dug two test holes to a depth of only about 214 feet, although required to dredge to a depth of 10 feet, one in the spoil area and one at the edge of the beach in front of the Station. They found sand mixed with some gravel and clay. An inquiry by Mr. Grand of some local fishermen produced no significant information.
On his second visit, Mr. Bivara probed the area to be dredged at three or four different places with a steel rod whereby he was able to penetrate to a depth of about 3 feet. The results of these probings indicated to him that the bottom was composed of sand and gravel to that depth. Mr. Bivara also visited a dredging operation on the western shore of Lake Montauk, some 1500 feet west of the Star *413 Island site. No dredging was actually going on at.tbat time, but his inspection of some previously dredged material revealed it to be sand. A local resident had installed some pilings about 2000 feet south of the area on the lake shore, and he informed Mr. Eivara that the material he encountered was soft and sandy.
Following this inspection, plaintiff submitted its bid. Shortly after being awarded the Coast Guard contract, plaintiff entered into a subcontract with the E & E Contracting Company, whereby plaintiff agreed to furnish the necessary lumber and timber, electrical appurtenances, and hardware, and E & E agreed to perform the dredging and pier construction in conformity with the'requirements of plaintiff’s contract with the Coast Guard, for a consideration of $16,700. Plaintiff asserts that its bid was based upon the subcontractor’s expectation that the subsurface conditions hi the area to be dredged would consist primarily of sand and gravel.
The subcontractor began dredging with an 8-inch hydraulic dredge, which is ordinarily effective only in dredging sand and gravel. Experience proved, however, that only the initial 3 to 4 feet of subsurface was composed of sand and gravel. Beneath that layer was hard clay, rock and stones of various sizes. The equipment, being inadequate for the removal of hard clay, rock and stones, was subject to frequent breakdowns and, ultimately, additional equipment was used to complete the job.
On September 17,1957, plaintiff made a written complaint concerning the subsurface condition, explaining that this subsurface condition was materially affecting the dredging operation and causing considerable additional costs for which it proposed to be reimbursed under the Changed Conditions clause of the contract. This provision reads as follows:
_ The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this- *414 contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or. decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
On January 14,1958, the contracting officer issued a decision rejecting plaintiff’s claim for an equitable adjustment. Plaintiff appealed this decision to the Coast Guard Board of Appeals. On May 2, 1958, the Acting Secretary of the Treasury issued his Findings of Fact and Determination, by which he affirmed the decision of the contracting officer and denied plaintiff’s claim “for want of proof.” On November 22, 1958, plaintiff filed this suit.
We direct ourselves first to the issue of whether or not plaintiff is entitled to compensation under the Changed Conditions clause of the contract. Under clause (1), as set out above, plaintiff argues that having “fully complied” with pre-bid inspection requirements of the contract and observing only sand and gravel, and having actually encountered hard clay, rock and stones of various sizes, the plaintiff comes within the terms of the Changed Conditions clause of the contract. Defendant takes the position that because the physical conditions at the site were not mentioned in the contract, the subsurface condition which was encountered at the site could not differ materially from those indicated in the contract. The administrative determination was that plaintiff did not qualify for an equitable adjustment under clause (1), since the contract did not refer to the subsoil condition; hence, clause (1) was simply inapplicable.
We concur. A similar situation was presented to this court in Ragonese, et al. v. United States, 128 Ct. Cl. 156. As in the instant case, the contract did not specify or represent the nature of the subsurface condition. The court held *415 that plaintiffs were not entitled to an equitable adjustment under clause (1), stating that where the contract is silent as to subsurface conditions, it “cannot be said that the contractor encountered subsurface or latent conditions materially different from those specifically shown on the drawings or indicated in the specifications.”
Defendant further contends that plaintiff is not entitled to relief under clause (2) in that the physical conditions at the site were not of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in this type of work, and could have been reasonably expected and discovered by plaintiff from an adequate examination of the site.
Paragraph 3 of the Additional General Provisions provides:
The bidders shall carefully examine the proposal, drawings, and specifications, and shall inspect the site of the proposed work in order to satisfy themselves, by examination, as to all local conditions affecting the contract, and as to the detailed requirements of construction. Failure to do so, will in no way relieve the successful bidder from the necessity of furnishing any material or performing any labor that may be required to complete the work in accordance with the drawings, specifications, and terms of the contract.
Each decision under this clause is dependent upon the facts and circumstances of the particular case. Where defendant makes no representations about subsurface conditions, and the bidder is required to visit the site and determine for himself the “actual conditions”, the bidder is required to make such inspection as is sufficient to reveal the conditions. If the facts show that the subsoil conditions encountered could not have been reasonably anticipated or foreseen from an adequate examination of the site, plaintiff is entitled to an equitable adjustment. But plaintiff made no such examination.
Plaintiff had the specifications and knew that the dredging requirements were to a depth of minus 10 feet. It had full warning that local conditions at the site should be inspected prior to bidding. Plaintiff had various methods of ascertaining subsurface conditions, and since it chose to rely on *416 the two test holes and the probings with a steel rod, plaintiff cannot be heard to say now that the subsoil condition was unknown or could not have been ascertained by an adequate inspection at the site.
The record reveals that eight local citizens were interviewed by the contracting officer after he received plaintiff’s complaint. All had knowledge of the fact, before the instant dredging, that a layer of hardpan, rock, gravel and clay existed just below the surface of the bottom. Thus, the contracting officer found that “the knowledge concerning the nature of the bottom seems to be common knowledge both in the sense of having been known for a long period and by most of the local citizenry.” This information was available to plaintiff through simple inquiry.
The contractor visited two locations on the western shore of the lake and found the material to be sand. But, again, further inquiry would have informed the contractor that the western shore had been built up by sand deposits from the nearby channel entrance and differs from other areas of Lake Montauk.
Upon this evidence, we can only conclude that plaintiff would have known that the substrata material consisted of sand, stone and boulders and clay had it adequately inspected the site.
Plaintiff further says that the Coast Guard had actual or constructive knowledge of subsurface conditions, which knowledge was wrongfully withheld from plaintiff. If the Coast Guard gave plaintiff erroneous and misleading information and concealed from plaintiff the true character of the subsurface conditions, such action would amount to misrepresentation and constitute a breach of warranty. However, the facts do not support this contention. The contract documents did not specify the nature of the subsoil conditions that might be encountered, and the Coast Guard personnel had no actual knowledge of the conditions. Whatever information was available from the files of the Navy, or the Corps of Engineers, concerning prior construction work performed in this area, of which the Coast Guard did not have actual knowledge, is not attributable to it. Neither the Navy nor the Corps of Engineers are parties to this contract. To *417 attribute knowledge to one agency of information contained in the files of another governmental department is absurd, in light of the vast number of Federal departments, bureaus, and agencies, and the tons of papers contained in the files of each. Bateson-Stolte, Inc., v. United States, 145 Ct. Cl. 387; Fansteel Metallurgical Corp., v. United States, 145 Ct. Cl. 496.
■ The defendant has brought into issue the question of plaintiff’s' standing to sue on behalf of its subcontractor, alleging that plaintiff has no liability to its subcontractor and is, therefore, precluded from bringing suit in its behalf. Having determined that plaintiff is not entitled to recover under the Changed Conditions, clause of the contract, we need not decide that issue.
Finding nothing arbitrary or capricious ha the administrative decision and that it is based upon substantial evidence, it is binding upon us.
Plaintiff is not entitled to recover, and its petition is, accordingly, dismissed.
It is so ordered.
Duefee, Judge; Laramore, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a New Jersey corporation engaged in the general contracting business in the State of New York and elsewhere. It brings this suit on behalf of its subcontractor, the B & B Contracting Company of Arverne, New York. Damages are alleged to have been sustained by reason of the subcontractor having encountered unknown physical conditions at the site of the work, as more particularly described hereinafter.
2. On May 6, 1957, the United States Coast Guard issued invitations for bid on the construction of a wharf and for dredging at Montauk Lifeboat Station, Star Island, Mon-tauk, New York. Paragraph 2 of the Instructions to Bidders provided:
*418 Conditions at Site of Worh. Bidders should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry, such as the location, accessibility and general character of the site, labor conditions, the character and extent of existing work within or adjacent thereto, and any other work being performed thereon.
Bids were received by the Coast Guard in response to said invitations, which bids ranged from plaintiff’s low bid of $88,450 to a high bid of $53,115.[1] On June 11, 1957, plaintiff as lowest responsive bidder was awarded Contract No. T03cg-2555 with the Coast Guard for a consideration of $38,450.
3. The contract required the plaintiff to furnish all labor, equipment, and materials for the performance of the work in accordance with specifications which provided for the construction of a wood pier, approximately 234 feet long (inclusive of ramp) by 7 feet wide, equipped with certain electrical equipment and accessories. All 54 wooden piles thereof were to be driven to a depth of approximately 25 feet minimum penetration as noted on an attached Coast Guard drawing No. NY-1731. Six of the 54 piles were to be driven to support the ramp on shore outside an area to be dredged. The specifications further provided for dredging to a depth of minus 10 feet below mean low water in an area specified in the aforesaid Coast Guard drawing. The drawing reflected approximate elevation and sounding data, but contained no reference to subsoil conditions. Also, neither the contract nor the specifications contained any specific reference to the actual nature of the subsoil conditions.
Paragraph 1-03 of the specifications provided:
Bidders shall visit the site to familiarize themselves with the actual conditions. Failure to do so shall in no way relieve the successful bidder of his responsibility to perform the specified work.
Paragraph 2-03 of the specifications relating to dredging requirements provided:
*419 Removal of Debris and Obstructions: All debris and obstructions, either natural or artificial, in way of the proposed work or in the channel to be dredged shall be removed to the depth indicated.
Three change orders were issued. Change Orders Nos. 1 and 8 provided for additional work and increased the total contract amount to $46,340. Neither is involved herein. Change Order No. 2 was issued on August 31,1957, and provided, in pertinent part, as follows:
change in specifications ecv-535: This change will be advantageous to the T7.S. Government and provides for an unforeseeable site condition consisting of large boulders in the bottom material: add the following to Article 3-03 of Section III of specifications ecve 535;
“Piles shall be driven to full penetration as indicated by the elevation on the plans and the pile length specified, or to refusal at a minimum penetration of Fifteen (15) feet. Kefusal is defined as a penetration of less than one-tenth (%o) inch per blow resulting from a 1,600 lbs. drop-hammer falling eight (8) to ten (10) feet. In the event that absolute refusal is encountered at less than Fifteen (15) feet, one (1) pile out of any contiguous group of four (4) may be driven to refusal at a penetration of not less than ten (10) feet. This change order shall result in no increase or decrease in the contract price and no change in the contract time.”
4. The contract also contained the standard Changed Conditions provision, reading as follows:
The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in •this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as *420 above required; provided that the Contracting Officer may, if lie determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon, the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
• Paragraph 3 of the Additional General Provisions provided:
The bidders shall carefully examine the proposal, drawings, and specifications, and shall inspect the site of the proposed work in order to satisfy themselves, by examination, as to all local conditions affecting the contract, and as to the detailed requirements of construction. Failure to do so, will in no way relieve the successful bidder from the necessity of furnishing any material or performing any labor that may be required to complete the work in accordance with the drawings, specifications, and terms of the contract.
5. The general site of the work called for by the above contract was the Coast Guard Station located since October 1955 on the northern tip of Star Island in Lake Montauk Harbor which is a few miles from Montauk Point, the easternmost extremity of Long Island, New York. Lake Montauk Harbor is a shallow body of water with a narrow inlet leading northward into Block Island Sound, and Star Island lies within the lake just south of the inlet. The subsurface conditions in Lake Montauk make dredging operations in the area very difficult due to a prevalence of rock formation, loose stone, boulders, and hardpan or clay.[2] This fact was common knowledge among persons closely connected with the water in and around Lake Montauk, such as resident fishermen and boat owners.[3] It is particularly well known to experienced dredging contractors located in the area of eastern Long Island. Also, since at least May 1936, the subsurface conditions in the general vicinity have •been known to the Corps of Engineers, U.S. Army, as a *421 result of channel surveys and dredging by the Corps in the area of Star Island. Prior to the commencement of work under the present contract, these subsurface conditions were not known to any personnel of plaintiff, or of its subcontractor. Likewise, these conditions were unknown to personnel of the Coast Guard involved in the negotiation of the present contract. Neither plaintiff, its subcontractor,[4] nor the Coast Guard had ever previously performed any dredging operations in the Lake Montauk area.
6. As a general contractor, plaintiff has never itself engaged in actual dredging operations but has used subcontractors for such work. In this case, it planned to, and did, employ the E & E Contracting Company to handle the necessary dredging and pier construction. The subcontract between plaintiff and E & E was entered into on June 25,1957, shortly after plaintiff was awarded Coast Guard Contract No. T03cg-2555. The subcontract provided that plaintiff would furnish the necessary lumber and timber, electrical appurtenances, and hardware, and for a consideration of $16,700, E & E agreed to perform the dredging and pier construction in conformity with the requirements of plaintiff’s contract with the Coast Guard.
7- In the first part of June 1957, prior to submission of plaintiff’s bid, and in keeping with the suggestion in paragraph 2 of the Instructions to Bidders, supra, Mr. Oscar Grand, plaintiff’s vice president, and Mr. Lucches Eivara, a partner of the subcontractor, visited the site in question on two different occasions. Their visual inspection of the area above the low-water mark showed the surface was composed predominantly of sand and gravel. They also observed a few large boulders and some accumulation of smaller rocks and cobblestones. They conversed with the officer in charge of the Coast Guard Station who had no personal knowledge or records as to the subsurface conditions in the area to be dredged but who drew their attention to a spoil area in the rear of the Station which he understood was composed of *422 material from a previous dredging operation in Lake Mon-tauk. The material in the spoil area was sand and gravel with a small amount of clay in it. The record is silent as to the precise origin of this material. Mr. Grand and Mr. Rivara dug two test holes to a depth of about 2% feet, one in the spoil area and one at the edge of the beach in front of the Station. They found sand mixed with some gravel and clay. An inquiry by Mr. Grand of some local fishermen produced no significant information.
On his second visit, Mr. Rivara probed the bottom of the area to be dredged at three or four different places with a steel rod. By using the rod he'was able to penetrate a depth of 3 feet or a little more, and the resulting indications to him were that the bottom was composed of sand and gravel to that depth. He also visited a dredging operation on the western shore of Lake Montauk about 1500 feet west of the Star Island site. Although no dredging was actually going on at the time, he inspected some previously dredged material and found it to be sand. About 2000 feet south of that area, a local resident had installed some pilings near the lake shore, and he informed Mr. Rivara that the material encountered was soft and sandy. This part of the western shore of Lake Montauk contains a deeper sand layer than the rest of the lake because its relative position to the nearby channel entrance is such as to cause sand to drift and build up on that shore.
Defendant contends that the prebid inspection of the site by plaintiff and its subcontractor was neither diligent nor thorough. To support this contention, defendant presented the testimony of Mr. H. R. Winters, a dredging contractor with 30 years’ dredging experience in the area of eastern Long Island, including Lake Montauk. The dredging firm by which Mr. Winters is employed did not bid on the job involved in this case. However, he testified that, in his opinion, the most satisfactory method of checking subsurface conditions in an area such as Lake Montauk would be through use of a jet pump by which it is feasible to explore subsurface conditions all the way to the intended dredging depth preferably at about 20-foot intervals throughout the *423 area. This is the method used by his firm where they are required to dredge to a depth of 10 feet or more. A probing rod can only furnish reliable information up to 5 feet in depth. From Mr. Winter’s experience, he estimated that the expense incident to jet exploration in this case would have been $1200 to $1400, and the expense of performing only test borings from a barge about $500.
8. Following its site inspections, plaintiff submitted its bid based upon the subcontractor’s expectation that the subsurface conditions in the area to be dredged would consist primarily of sand and gravel. Actual experience proved, however, that only the initial 3 to 4 feet of subsurface was composed of sand and gravel. Beneath that layer was hard clay, rock, and stones of various sizes. The subcontractor commenced dredging on July 8, 1957, with an 8-inch hydraulic dredge[5] stationed at the farthest point from shore. Two days later the clay strata was first encountered, necessitating the use of a jet pump to stir up the bottom. The Coast Guard Inspector’s Beport of July 11, 1957, reflects increasing difficulties through encountering of stone causing a breakdown of the dredge pump. Commencing July 16, 1957, and continuing to the completion of dredging on October 25, 1957, each of the Coast Guard Inspector’s reports for days when dredging was taking place states that the materials being dredged were “sand, stone, clay and hardpan.”[6] The least difficult material was found farthest from shore where dredging was commenced, but it increased considerably in density and toughness as the operation proceeded inshore. While the jet pump was of some help, numerous delays were occasioned by stones clogging up the suction pipes and jamming the pumps and by the hardness of the clay. On August 27, 1957, a crane with a % cubic yard light-duty bucket arrived for use in driving piles in deep water. Later, from September 16 to October 25, the crane was also used to break up the clay, feed it to the pump and to bucket up the stones and hardpan onto the shore. Ultimately, a half cubic yard heavy-duty bucket and a *424 shovel loader were used. On arrival at the site, all of .the aforesaid equipment was in good working condition.
■ Defendant’s expert witness, Mr. Winters, testified that from his long experience in dredging around Lake Montauk,[7] he would not have considered using a hydraulic dredge on this project, and that an 8-inch dredge with or without a cutter head would not be effective. He would have utilized a heavy-duty '% cubic yard dragline crane equipped with a y2 cubic yard heavy-duty bucket. Further, he would have laid out heavy mats as a ramp to provide firm footing for the dragline so that it could obtain a solid bucketful, rather than mount it on a barge which would bob around in the water. He would then have used one or two caterpillar bulldozers to push the dredgings onto the shore.
9. As previously stated, none of the personnel of either party associated with this contract had any actual knowledge of the subsurface conditions above described.[8] Plaintiff contends, however, that by reason of subsurface information contained in the files of the Army Corps of Engineers and the United States Navy, the Coast Guard may be deemed also to have had the information and should have imparted it to plaintiff.
There is no evidence that the Corps of Engineers had ever previously conducted a dredging operation in the specific area involved in this case. However, the record does contain soundings and probing drawings prepared by the Corps between May 1936 and October 1942, which, while they do not contain actual boring data, do portray some information as to the subsurface conditions encountered by probing along the northern shore of Star Island. These drawings disclose the existence there at that time of scattered boulders, stones, clay, and hard packed sand, together with several notations *425 “Imp.” (impenetrable) at points in the specific area involved.[9]
The record also contains a comprehensive report by the United States Navy narrating its experience in the construction during 1943 of a Naval torpedo testing range on eastern Long Island which project included the construction of a dock approximately 500 feet from the site involved in this case.[10] This report makes no reference to any particular difficulty encountered in the dredging and pier work accomplished at Star Island other than to describe the excavated material as a “well graded mixture from very fine sand to gravel, and its porosity was surprisingly low.” No unusual difficulty appears to have been experienced in driving piles for the pier, other than in bypassing a large rock, nor was any difficulty recorded in dredging with a 4-cubic yard dipper dredge. However, despite the absence in the Navy report of any significant reference to dredging difficulties, defendant’s expert witness, Mr. Winters, testified that in 1942 he personally observed and participated in dredging work for the Navy and Corps of Engineers at Star Island adjacent to the area here involved, and that it was a very difficult operation. It was particularly difficult work when using a hydraulic dredge because of frequent stone damage to the impeller.
The Chief of the Civil Engineering Section, Third Coast Guard District, Captain Daniel Lucinski, who had the responsibility for the pre-construction planning of the dredging and pier construction in this contract, had never seen the aforesaid Corps of Engineers drawings or Navy report. He did know that the Corps of Engineers had dredged in the general area and that the Navy had constructed the *426 aforesaid dock during World War II. He and Ms tecMiical assistant bad visited the site in connection with the drafting of the specifications and attached drawing. Captain Lucinski did not order any exploratory borings prior to the issuance of the plans and specifications because the contemplated project was a small one and because he believed that dredging contractors would know the general conditions of the area. However, he did instruct his assistant to obtain from the Corps of Engineers the latest information on the area. The assistant asked the Corps for such data and, in response to that request, he received a soundings drawing of the channel area in Lake Montauk Harbor, dated May 5, 1955. The soundings and probing drawings referred to above were not furnished him.[11] The May 5, 1955, soundings drawing contained no data relating to subsurface conditions, and because it did not even indicate sufficient soundings at the exact location of the instant project, the Coast Guard itself took soundings which were noted on the drawing attached to the present specifications. On application by the Coast Guard, the Corps of Engineers issued a permit for the performance of this work.
10. Chief Petty Officer Sutyak was the Coast Guard Inspector stationed at the site of the work as the authorized representative of the contracting officer. The latter’s office was in New York City. He never visited the worksite but was kept informed on the progress of this job through the medium of daily reports from Mr. Sutyak. Within a few days after commencement of the work, Mr. Sutyak became aware of the difficulties being encountered by plaintiff’s subcontractor in excavating the subsurface material. In addition to the frequent references in his reports of “sand, stone, clay, and hardpan” in the dredging area as described in finding 8, Mr. Sutyak’s July and August reports contain references to equipment breakdowns due to pumping stone, dredging delays due to encountering excessive and increasing amounts of stone, and the necessity of removing large boul *427 ders and stone obstructions in the way of piles. These matters were the subject of numerous oral discussions during this period between Mr. Sutyak, Mr. Grand, and Mr. Bivara. Around the first of August, Mr. Rivara inquired of Mr. Sutyak whether it would be possible to get additional compensation, and Mr. Sutyak said he would try. However, no reference is made to these discussions in the daily reports of either party, and it was not until September 17, 1957, that plaintiff made any written complaint.
On that date, plaintiff wrote the following letter to the Commander, 3d Coast Guard District in New York City:
In connection with the above listed contract, we are encountering a latent subsurface condition which is materially effecting (sic) our dredging operation. This we feel is a changed condition as outlined in paragraph #4 of General Provisions.
In the absence of borings or other subsurface information we visited the site and found that the surface material was a dense sand. Based upon this, we submitted our bid.
However, the material encountered consists of clay, boulders and minute amounts of sand, causing us considerable additional expense not contemplated in the original bid for the dredging work.
This subsurface material is of an unusual nature, differing materially from material ordinarily encountered and generally recognized as inherent in the work of the character provided for on this contract.
We are proceeding with the performance of the contract and keeping a record of this additional cost for which we propose to be reimbursed.
On November 13, 1957, plaintiff sent the following letter to the Coast Guard:
In accordance with our letter dated September 17, 1957, we are submitting herewith our proposal of the additional expense incurred for the dredging on the above listed contract.
Based on a proposed completion of dredging on Aug. 24, 1957 and a final completion of dredging on Oct. 25, 1957, the following is our claim. Please note that while the going rate for the dredge is $1,000.00 per week, we are listing it for $750.00 per week on account of its continued use. Also, the charges for the barge crane are. only for the time it was used in the dredging operation.
*428 Dredge, 9 weeks at $750.00 per week-$6, 750.00
Barge crane, 24.5 days at $120.00 peí day- 2, 940.00
Total equipment_ 9,690.00
Labor for dredge:
1 leyerman, 9 weeks at $130.00 per week- 1,170.00
1 engineer, 9 weeks at $116.00 per week- 1, 044.00
1 carpenter helper, 4.5 weeks at $116.00 per week— 522. 00
Labor for crane:
1 crane operator, 4.9 weeks at $170.00 per week- 833.00
1 carpenter helper, 4.5 weeks at $116.00 per week— 522. 00
Total for labor only- 4,091.00
Taxes on labor only: Percent
Compensation- 10.56
Liability- 4
Unemployment Insurance- 3
Social Security- 2.25
Welfare fund_ 5
Paid holidays- 3
Gross receipts- . 005
Total_ 27. 86 $1,139. 75
5,230.75
Total equipment- 9, 690. 00
14,920. 75
10 percent overhead- 1,492.08
16,412.83
10 percent profit- 1,641.28
Total_._$18,054.11
11. On January 14, 1958, the contracting officer issued a decision rejecting plaintiff’s claim for an equitable adjustment. Said decision reads in pertinent part:
* # * ❖ *
2. The question of fact to be determined in rendering this decision is whether the condition encountered at the site is or is not a changed or latent condition as outlined in paragraph 4.
a. Did ^the subsurface or latent physical condition differ materially from those indicated in this contract?” — The physical conditions at the site were not mentioned in the contract concerning the dredging por *429 tion of the work other than providing approximate sounding and elevations. The condition which was the subject of reference (a) could not therefore differ materially from those indicated in the contract. Thus the conditions actually encountered at the site cannot be considered a latent or changed condition under this provision.
b. Were the “unknown physical conditions at the site of an unusual nature; differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract?” It would not seem that the conditions outlined in reference (a) can be considered changed from those ordinarily encountered in the area.
(1) The Geologic Map of Long Island enclosed with Professional Paper No. 82, Document 586 titled the Geology of Long Island, New York indicates a prevailing sand and gravel condition to exist at the North End of Star Island the area in question.
(2) It appears to be common knowledge that gravel, rock and a hard layer of clay exist at the surface of the bottom and near the surface of the bottom. That this condition appears to be common knowledge is substantiated by the fact that of 8 citizens of the local area who were interviewed on this subject all had knowledge of the fact that a layer of hardpan, rock, gravel and clay existed just below the surface of the bottom. The knowledge possessed by the local citizenry was not the result of the contractors’ recent dredging experience. The knowledge concerning the nature of the bottom seems to be common knowledge both in the sense of having been known for a long period and by most of the local citizenry.
It would not appear that the conditions actually encountered at the site were unusual for the area or that they differed materially from those ordinarily encountered in the area and generally recognized as inhering in work of the character provided for in this contract.
Therefore it seems the basic issue should be answered by stating that the conditions as claimed. . . . are not changed conditions at the site as described in paragraph 4 of the General Provisions.
3. In the absence of specific government furnished information as to the nature of the surface of the bottom and the material beneath the surface of the bottom each bidder “should visit the site to ascertain pertinent local conditions readily determined by inspection and inquiry.” This is in accord with paragraph 2 Standard *430 Form 22 Instructions to Bidders which, was a part of the Invitation for Bid. In view of the contents of paragraph 2 of this letter it is the opinion of this office that the other bidders on this job based their bid on the expectation of encountering gravel, rock and a hard layer of clay in the dredging portion of the contract and therefore would have completed the contract work at the price bid had they been the low responsive and responsible bidder and were accordingly awarded the contract. The government is required to have the work specified in the Invitation For Bid accomplished by the lowest acceptable bidder. Under the circumstances were the government to honor your request for additional payment, the cost of the specified contract work would exceed the price of the lowest acceptable bid as well as the bids of the other bidders. This would be unfair and considered discriminatory.
4. The decision of the contracting officer is that the work as specified is to be accomplished at the price bid and that additional payment cannot be made under the known circumstances. . . .
On March 18, 1958, the plaintiff appealed the foregoing decision to the Coast Guard Board of Appeals. On May 2, 1958, the Acting Secretary of the Treasury issued his Findings of Fact and Determination by which he affirmed the decision of the contracting officer and denied plaintiff’s claim “for want of proof.” On November 22,1958, plaintiff filed this suit.
12. Change Order No. 2 quoted in finding 3, supra, was issued August 31, 1957, by the contracting officer on the recommendations of the Coast Guard Inspector, Mr. Sutyak, and the Civil Engineering Section of the 3d Coast Guard Distinct. About 10 days prior to the issuance of the formal change order, Mr. Sutyak had been given verbal permission to relax the minimum pile penetration requirement of the contract from 25 feet to 15 feet.
At the trial, the contracting officer attempted to explain the apparent inconsistency between the adverse findings in his above-quoted decision issued January 14, 1958, and his finding in Change Order No. 2, issued August 31, 1957, that there existed “an unforeseeable site condition consisting of large boulders in the bottom material” justifying relief to the contractor through reducing the required minimum *431 penetration for piles under stated conditions from 25 feet to 15 feet.[12] He testified that the finding contained in the change order had relation only to the piling operation as distinguished from the dredging operation. He did not think that the Government could reasonably expect prospective bidders in the course of their site investigation to probe for boulders to the minimum 25-foot penetration depth required for each of the 54 pilings specified on the plans, but he did feel it reasonable to expect such bidders to ascertain what subsurface conditions would be encountered in dredging only to a 10-foot depth.
13. As detailed in its letter of November 13,1957 (finding 10, supra), plaintiff seeks damages in the sum of $18,054.11. This amount is claimed to represent the total of excess dredging costs incurred by plaintiff’s subcontractor between August 24, 1957, the expected completion date,[13] and October 25, 1957, the actual completion date, or a period of 9 weeks’ additional work attributable to the dredging difficulties. Mr. Kivara believed that his firm had lost “well over $10,000” because of the subsurface conditions in the dredging area.
The following tabulation constructed from the evidence of record fairly represents the excess dredging costs incurred by plaintiff’s subcontractor by reason of encountering the subsurface conditions heretofore described:
Hydraulic dredge (9 weeks)_ $3,392.45
Barge, crane, and bucket (4.5 weeks)_ 1,413.82
Labor cost:
Leverman (318 hours)_ 1, 033.50
Crane operator (119 hours)_ 505.75
Engineer (302 hours)_ 875.80
Carpenter’s helper (134 hours)_ 388.60
Total excess costs_ 7, 609.92
There is no probative evidence of record supporting plaintiff’s claim for taxes paid, its overhead allocation of 10 per *432 cent of excess costs, or its claimed rate of 10 percent for profit.
14. Plaintiff paid its subcontractor, B & B Contracting Co., the total sum of $21,844 in several installments. Plaintiff’s final check to E & E dated April 30, 1958, contains the notation “Paid in Full.” Mr. Oscar Grand could not recall whether he or the bookkeeper had placed those words on the check. Mr. Eivara has an informal understanding with plaintiff’s president that E & E will receive a percentage of any amount which may be recovered by plaintiff herein. He could recall no agreement as to a fixed percentage, but in his opinion, plaintiff would be entitled to retain 15 percent of any judgment awarded herein. In any event, he does not hold plaintiff responsible for the losses sustained, as described above, and does not intend to sue plaintiff therefor whatever may be the outcome of this case.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is, therefore, dismissed.

 This bid was submitted by Spearin, Preston & Burrows, Inc., a dredging contractor with long experience in the Montauk area. It was the Marine contractor on the United States Navy project referred to in finding 9, infra.

 Further to tlie west, substrata conditions on and near Long Island tend to be predominantly sand and gravel. The difference in the two areas is generally attributed to glacial activity.

 The nautical chart for Block Island Sound issued as a navigational aid by the U.S. Coast and Geodetic Survey indicates a hard and rocky bottom generally along the shoreline of eastern Long Island and Lake Montauk.

 The subcontractor’s prior dredging operations on Long Island were conducted in the western and southern part of the island where the materials to be dredged were sand, gravel, and silt, enabling the efficient use of hydraulic dredges.

 Ordinarily, suck equipment is able effectively to dredge sand and gravel.

 Altogether 56 inspection reports make specific reference to this condition,

 In performing’ excavation ana dredging work throughout eastern Long Island, this witness has encountered such adverse conditions that for many years his company will undertake such work only on a “cost-plus” basis anywhere “east of Amagansett.”

 The Chief Warrant Officer in charge of the Coast Guard Station testified that some local fishermen had once told him about difficulties experienced in the construction of a nearby Navy diock in 1943 and that there had been “considerable trouble in setting down their piling and so forth.” However, he had no actual knowledge of the subsurface conditions.

 Subsequent to the dates of these drawings, the Corps of Engineers abandoned its previous practice of classifying probings or wash borings except in the case of rock formation believed likely to require drilling or blasting. This change was due to the conclusion that previous classifications of probing information were likely to be misleading. The Chief of the Operations Branch, New York District, Corps of Engineers, who supervises the preparation of plans and specifications for dredging, testified that even after examining the soundings and probing drawings in evidence herein, he could not know the present-day subsurface conditions at Lake Montauk. Even borings do not always disclose a true picture of the subsurface condition in any area to be dredged or excavated.

 Erom October 1955 to the completion of the dock undier the present contract, the Coast Guard docked its boats at this Navy dock.

 As pointed out in footnote 9, supra, the Corps does not consider such drawings to be informative as to true subsurface conditions. ¿The fact remains that these earlier drawings by the Corps reflected a subsurface condition quite similar to that later encountered by plaintiff’s subcontractor.

 However, only two of the 54 pilings were not driven to the 25-foot minimum penetration as specified originally, and these two exceptions were ramp pilings at the shore end in the area not to be dredged.

 The original completion date provided by the contract was August 3, 1957, but Change Order No. 1, calling for additional work, extended the contract completion date to August 24, 1957.