**ROY F. WESTON, INC.**

v.

**HALLIBURTON NUS ENVIRONMENTAL CORPORATION**

v.

**ROY F. WESTON, INC., and Indiana Lumbermens' Mutual Insurance Co.**

Civ. A. No. 91–1133.

United States District Court, E.D. Pennsylvania.

March 17, 1993.

**1152**

Barry M. Klayman, Steven A. Arbittier, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for Weston Services, Inc. and Roy F. Weston, Inc.

Suzan E. De Busk, Edward S.G. Dennis, Jr., Morgan, Lewis & Bockius, Philadelphia, PA, for Nus Corp.

John N. Joseph, Philadelphia, PA, for U.S. E.P.A. and the U.S.

Barry M. Klayman, Steven A. Arbittier, Wolf, Block, Schorr and Solis–Cohen, Jane Landes Foster, Stradley Ronon Stevens & Young, Debra C. Swartz, Wolf, Block, Schorr and Solis, Philadelphia, PA, for Indiana·Lumbermens' Mut. Ins. Co.

### MEMORANDUM AND ORDER

HUTTON, District Judge.

Presently before the Court is defendant/counterclaim plaintiff Halliburton NUS Environmental Corporation's ("Halliburton NUS") Motion for Summary Judgment, and plaintiff/counterclaim defendant Roy F. Weston, Inc. ("Weston") and counterclaim/defendant Indiana Lumbermens' Mutual Insurance Co.'s ("Indiana Lumbermens") reply.

### BACKGROUND

Plaintiff/counterclaim defendant, Roy F. Weston, Inc., is a Texas corporation involved in the business of providing demolition, dismantling and disposal services. On January 26, 1990, Weston entered into a subcontracting agreement with defendant Halliburton NUS to provide its services at the Douglass-

ville Disposal Site located in Berks County, Pennsylvania. Douglassville is a federal Superfund site on the National Priorities List.[1] The site is the location of a former oil reprocessing facility. The hazardous waste of concern in the present subcontracting agreement was composed of oils, sludges, solvents, asbestos and contaminated solids such as building materials and tanks.

Pursuant to the subcontracting agreement, Weston was to dismantle the facility and to dispose of the hazardous liquids and sludges located in the above ground tanks on the site. The specific requirements of the contract included the following: site preparation and maintenance; removal of asbestos materials; pumping of liquids and sludges from the tanks to tanker trucks and the draining of free liquids from the site; dismantling and removal of all buildings, tanks, equipment, piping, drums and miscellaneous materials; waste hauling and disposal; and related services, such as health and safety, sampling and analysis, and decontamination of equipment materials and personnel. The total contract price was not to exceed $3,256,731.00.

During execution of the contract, Weston experienced difficulty with the pumpability of the contents of the tanks. Weston encountered solid material which could not be removed via pumping. Relations between the two parties broke down and Halliburton NUS eventually terminated Weston's rights under the contract. Weston subsequently brought the instant suit.

Weston's complaint contains three counts against Halliburton NUS arising out of their contractual relationship for the dismantling and disposal services involving the Douglassville Disposal Site located in Berks County, Pennsylvania.[2]

In count I of the complaint, Weston alleges that Halliburton NUS breached the contract. The complaint alleges in pertinent part:

---

1. The National Priorities List is a ranking of hazardous waste sites compiled by the federal government pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Superfund Amendments and Reauthorization Act ("SARA").

2. Count II of the Complaint seeking injunctive relief to prevent Weston's termination for default was dismissed by the Court by Order dated March 11, 1991.

37. Pursuant to the contract, NUS is required to investigate site conditions promptly after receiving notice of conditions which differ materially from those indicated in the contract and, if the conditions do materially so differ and cause an increase or decrease in the contractor's cost or the time required for performing any part of the work under the contract, make an equitable adjustment to the contract.

38. The Site conditions materially differ from those indicated in the contract such that an equitable adjustment to the contract must be made.

39. [Weston] is entitled to a modification of the contract to reflect actual site conditions and to allow it to properly handle and dispose of the nonpumpable tank solids in the quantities at which they are present at the site. The modification should include an equitable adjustment to the contract price and completion date.

40. The failure and refusal of NUS to address the defective specifications and/or differing site conditions caused by the presence of substantial quantities of nonpumpable solid materials in the sumps and aboveground tanks by authorizing and approving a change order specifying the manner in which the work may proceed and making an equitable adjustment to the contract constitutes a willful and material breach of the contract.

41. The aforesaid breach and continuing interference by NUS has rendered performance of the contract by [Weston] impossible.

Count III of the complaint alleges negligent and willful misconduct. The complaint alleges in pertinent part:

50. NUS has a duty and obligation to administer the contract in good faith and so not to interfere with, delay or hinder [Weston's] performance thereunder.

51. NUS has acted unreasonably and in bad faith in administering the contract by failing and refusing to investigate or recognize conditions which differ materially

from those indicated in the contract and to make an equitable adjustment to the contract.

52. NUS has failed and refused to approve any reasonable proposal for the handling and disposal of the solid material in the aboveground tanks at the site, thereby preventing [Weston] from performing the contract.

53. The conduct of NUS is willful and deliberate and intended to put [Weston] in breach in order to cover up and conceal the defective specifications in the contract documents prepared by NUS and its negligent administration of the contract.

54. Weston has been injured in its business and reputation as a result of the unlawful conduct by NUS.

In answer to the complaint, Halliburton NUS filed a counterclaim against Weston and Indiana Lumbermens. The latter counterclaim defendant, Indiana Lumbermens, is Weston's surety. Indiana Lumbermens agreed to indemnify Halliburton NUS in case of a breach or failure of performance by Weston under the Douglassville Site dismantling and disposal contract. Halliburton NUS's counterclaim alleges that Weston materially breached its contract by failing to prosecute the work diligently or to complete the work by the extended contract completion date. (Amended Counterclaim at ¶ 5).

On January 29, 1993, the Court decided two motions in limine filed by Halliburton NUS. In the wake of the Court's Order, Halliburton NUS has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on counts I and III of Weston's complaint. Halliburton NUS also seeks judgment on the issue of liability under the counterclaim against Weston and Indiana Lumbermens.

The contract language in describing the scope of the project and work on the tanks requires that all materials, whether liquid or solid, were to be removed from the tanks so that the tanks themselves could be dismantled.[3] The contract called for the complete

---

**3.** 1.3 SCOPE OF PROJECT

The scope of this project includes the dismantling of the Former Process Facility and appurtenances and the disposal of materials and wastes associated with these activities.

removal of the contents of the tanks.[4] The contract also recognized that some of the contents might not be pumpable, yet still required its removal.[5]

Accordingly, this Court finds that the contract is not ambiguous with respect to the removal of the contents of the tanks located at the Douglassville Site.

## DISCUSSION

■ The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, this Court will resolve all reasonable doubts and inferences in favor of the nonmoving party. *Arnold Pontiac—GMC, Inc. v. General Motors Corp.*, 700 F.Supp. 838, 840 (W.D.Pa.1988).

The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.*

The Supreme Court articulated the allocation of burdens between a moving and non-moving party in a motion for summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552–53. The Court also held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions, on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. (quoting Fed.R.Civ.P. 56(e)).

The Supreme Court further elaborated on the type of evidence that the nonmoving party is required to adduce in order to withstand a motion for summary judgment:

We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred [a genuine issue of material fact].

*Id.*

### I. Count I

■ Count one alleges a differing site condition and seeks damages and a time exten-

---

4. TANKS
>   PART 1—GENERAL
>   1.1 SUMMARY
>   1.1.1 This section details the work to be performed to dismantle and prepare for offsite hauling and disposal all of the tanks and contents ...
>   1.1.2 This work shall include, but not be limited to, the removal, containerization, and temporary storage of the present contents of the tanks ...

. . . . .

PART 3—EXECUTION
>   3.1 REMOVAL OF CONTENTS
>   3.1.1 The Contractor shall remove the present contents of the tanks as a prelude to decontamination and dismantling activities. [...]

5. 3.1.3 In general, it is anticipated that the tank contents can be removed via pumping; however, the Contractor shall be prepared to provide alternative removal means, as needed. Any method of removing the tank contents other than pumping shall be subject to the approval of NUS.

sion on the basis of delays caused thereby. Essential to the breach allegation is the notion that Weston is entitled to an equitable adjustment under the contract's differing site condition clause because of the presence of approximately 500 tons of non-pumpable solids in the tanks at the Douglassville Site.[6]

The "Differing Site Conditions" clause, in pertinent part, provides:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) **subsurface or latent physical conditions at the site which differ materially from those indicated in this subcontract,**
> . . .

General Provision Article 9.3. (emphasis added). Pursuant to this provision, Weston would be entitled to an equitable adjustment where the actual conditions at the site are materially different from that which the subcontract indicated. *See A.S. McGaughan Company, Inc. v. U.S.,* 24 Cl.Ct. 659 (1991); *P.J. Maffei Bldg. Wrecking Corp. v. U.S.,* 732 F.2d 913 (Fed.Cir.1984). "A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *P.J. Maffei Bldg. Wrecking Corp. v. U.S.,* 732 F.2d at 916, (*citing S.T.G. Construction Co., Inc. v. U.S.,* 157 Ct.Cl. 409, 414, 1962 WL 9272 (1962)). It is a matter for the court to decide what the contract indicates. *Id.*

■ This Court, in its Order of January 29, 1993, held that the contract between the parties unambiguously required that all materials within the tanks at the Douglassville Site were to be removed regardless of pumpability. The Court stated that the "scope of the project and work on the tanks suggests that all materials, whether liquid or solid, were to be removed from the tanks so that the tanks themselves could be dismantled." *Weston v. Halliburton NUS,* 838 F.Supp. 1153, 1156 (E.D.Pa.1993). This Court's ruling establishes that "non-pumpable tank solids" is not sufficient as a matter of law to

support a claim for differing site condition. Further, the "cardinal change" theory advanced by Weston is inapplicable because the removal of non-pumpable materials was part of Weston's obligation all along.

It is well established that the "doctrine of law of the case dictates that 'when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation.'" *Matter of Resyn Corp.,* 945 F.2d 1279, 1281 (3d Cir. 1991), (citations omitted). This Court's Order of January 29, 1993 has essentially determined that the contract "indicates" that all the contents were to be removed from the tanks at the Douglassville Disposal Site regardless of pumpability. The Court has not been directed to any provision in the contract which guarantees that all the contents of the tanks will be pumpable. In fact, as the Court noted, the contract language states that the contents of the tanks might not be pumpable.

This Court has also held that the failure to issue a change order, assuming that a changed condition did indeed exist, could not prevent Weston's performance under the contract. The parties clearly articulated a procedure within the contract to address the situation. "Weston had available a means under [contract provision] 9.1(b) to continue performance and protect its interests regardless of Halliburton NUS's failure to physically issue a change order." *Weston v. Halliburton NUS,* 838 F.Supp. 1153, 1157 (E.D.Pa.1993). Further, since the contract does not state that all the materials in the tanks will be pumpable, the presence of non-pumpable tank solids cannot constitute a differing site condition.

In response to Halliburton NUS's motion for summary judgment on count one, Weston has argued that summary judgment is inappropriate because Weston is entitled to convert the "termination for default" into a "termination for convenience." Contract, Stan-

---

6. For purposes of this motion, the Court accepts Weston's assertion that 500 tons of non-pumpa-ble material remains in the tanks at the Douglassville Site.

dard General Provisions, art. 14.1 and 14.2.[7] However, this argument has no relevance to this Court's determination of whether Halliburton NUS is entitled to summary judgment on count one of the complaint.

Count one by its terms does not include a claim for conversion of Weston's termination for default. As the Court explained, count one seeks relief based on an allegation that Halliburton NUS should have investigated and adjusted the contract because of a changed condition under the contract. In fact, the complaint was drafted and filed before Weston was terminated for default. The complaint was filed on February 22, 1991. Halliburton NUS terminated Weston for default on March 21, 1991.

Accordingly, Halliburton NUS is entitled to judgment as a matter of law on count one.

## II. *Count III*

■■■ Count three of the complaint alleges negligent and willful misconduct. Generally, under Pennsylvania law, courts are reluctant to allow recovery in tort for a contract breach. *Wood & Locker, Inc. v. Doran and Associates*, 708 F.Supp. 684 (W.D.Pa. 1989). "A tort claim may be maintained only when 'the wrong ascribed to defendant [is] the gist of the action, the contract being collateral.'" *Id.* at 689. (*quoting Closed Circuit Corp. of America v. Jerrold Electronics*, 426 F.Supp. 361, 364 (E.D.Pa.1977)); "A claim *ex contractu* cannot be converted to one in tort simply by alleging that the conduct in question was wantonly done." *Closed Circuit Corp. of America v. Jerrold Electronics*, 426 F.Supp. 361, 364 (E.D.Pa.1977).

Careful consideration of Weston's claim in count three, its pre-trial memorandum and opposition to the motion for summary judgment, reveals that the wrong described is not "collateral" to the contract. Weston has alleged a violation of its duty to administer the contract in good faith. Weston bases the

claim on the refusal to investigate or recognize a differing site condition and to make an equitable adjustment under the contract. Weston also alleged that the failure of Halliburton NUS to approve any reasonable proposal for handling and disposing of the confronted tank contents prevented Weston's performance. Weston's statement that Halliburton NUS willfully and deliberately intended to put Weston in breach of its contract to conceal defective contractual specifications prepared by Halliburton NUS and its negligent administration of the contract add nothing to the allegation. These claims merely restate the contract claim alleged in count one.

Further, the damages which Weston seeks also support the conclusion that Weston's claim is merely a restatement of their contract claim. Weston's damages are solely based on the contract. Weston's pre-trial memorandum, which must assert the damages which the plaintiff seeks to recover, provides:

> "Weston seeks to have the termination for default converted to a termination for convenience and claims as damages the balance due for work performed prior to the termination in the amount of $1,454,062.10 ...

> Weston also seeks damages in the amount of $15,510 as reimbursement for the cost of continuing the contract bonds for the project through June 8, 1992.

(Weston's Pre–Trial Memorandum at 14).

For the reasons stated in granting judgment on count one, summary judgment on count three will also be granted in favor of Halliburton NUS.

## III. *Counterclaim Liability for Default Termination*

■■■ Halliburton NUS has moved for summary judgment on the issue of liability for

---

7. 14.2(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include ... (iii) acts of the Purchaser or acts of the

Government, in either its sovereign or contractual capacity ...

14.2(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the purchaser.

Weston's default under the contract. Halliburton NUS terminated Weston's rights under the contract for failure to complete the work or to prosecute the work with diligence. General Provision 14.2 of the contract permits Halliburton NUS to terminate Weston for these reasons. The contract provides:

> 14.2(a) If the contractor refuses or fails to prosecute the work or any separable part, (which shall be defined as the milestones provided in the contractor's approved schedule) with diligence that will insure its completion within the time specified in this subcontract including any extension, or fails to complete the work within this time, the purchaser may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.... The Contractor and its sureties shall be liable for any damage to the Purchaser resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated.

The material facts involving this allegation are not in dispute. As of December 23, 1990, the extended contract completion date for the dismantling obligation at the Douglassville Site, Weston had not completed its duties under the contract. By Weston's estimate, in excess of 500 tons of petroleum-based material still existed in the tanks. Further, Weston had not entered into a sub-contract for incineration of the non-pumpable contents. Halliburton NUS is entitled to judgment as a matter of law.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of March, 1993, upon consideration of the Motion of Defendant/Counterclaim Plaintiff W:/Halliburton NUS Environmental Corporation for Summary Judgment and Plaintiff/Counterclaim Defendant Roy F. Weston, Inc. and Counterclaim Defendant Indiana Lumbermens' Mutual Insurance Co.'s response thereto, IT IS HEREBY ORDERED that Halliburton NUS's Motion is **GRANTED**.

IT IS FURTHER ORDERED:

(1) Count I of Weston's Complaint is **DISMISSED** with prejudice;

(2) Count III of Weston's Complaint is **DISMISSED** with prejudice;

(3) Weston is precluded from offering evidence to show, or from asserting or arguing, at trial that a "cardinal change" occurred on the Douglassville project; and

(4) Judgment for Halliburton NUS is **GRANTED** on its counterclaim as to liability. The termination of Weston for default was proper under the contract, and Weston and Indiana Lumbermens are liable to Halliburton NUS for damages for the said default. The issue of the amount of damages is reserved for trial.