**ALLIED FIRE & SAFETY EQUIPMENT COMPANY, INC., Plaintiff,**

v.

**DICK ENTERPRISES, INC. et al., Defendants.**

**No. 94–CV–3489.**

United States District Court, E.D. Pennsylvania.

Aug. 22, 1997.

Robert T. Carlton, Jr., Ellsworth, Wiles & Chalpin, Philadelphia, PA, for Plaintiff.

Roy A. Powell, Brian C. Castello, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for Defendant Dick Corporation.

James D. Hollyday, Michael P. Subak, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Defendant PA Convention Center Authority.

Bruce D. Lombardo, Frederick A. Warner, Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, King of Prussia, PA, for Defendant Thompson, Ventulett, Stainback & Associates, et al.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

### INTRODUCTION

This diversity action concerns the construction of the Exhibit Hall building of the Pennsylvania Convention Center ("PCC") in Philadelphia, Pennsylvania. Dick Enterprises, Inc. ("Dick" or "Dick Enterprises") served as the general contractor and entered into a contract with the owner of the PCC, the Pennsylvania Convention Center Authority ("PCCA").[1] Plaintiff Allied Fire and Safety Equipment Company ("Allied") was the subcontractor for installation of the fire protection systems in the Exhibit Hall. Plaintiff brought this complaint against Dick Enterprises and its sureties, American Casualty Company ("ACC") of Reading, Pennsylvania, and Continental Casualty Company ("CCC"), asserting claims for breach of contract, quasi-contract recovery, negligence and loss of bonding capacity.[2]

Dick Enterprises then filed a Third–Party Complaint against the PCCA, and the PCCA in turn filed a Fourth–Party Complaint against several design professionals who were hired for the project.[3]

After the parties conducted discovery, Dick Enterprises filed a summary judgment

motion to dismiss the complaint filed against it by Allied. Defendant PCCA also filed a summary judgment motion to dismiss the Third–Party Complaint filed against it by Dick Enterprises. This memorandum resolves both motions.

### BACKGROUND

In October 1990, the PCCA instituted a competitive bidding process in order to award the General Construction Contract ("the Prime Contract") for the construction of the Exhibit Hall Building of the PCC. Ultimately, Defendant Dick Enterprises was awarded the Prime Contract, a voluminous document which includes specifications for the work of the various subcontractors as well as Articles containing General and Supplementary Conditions.

Dick Enterprises then engaged Allied as the subcontractor responsible for the sprinkler and fire safety systems, and they executed a subcontract (the "Subcontract") around April 4, 1991. The Subcontract in turn contained Articles and also incorporated certain sections of the Prime Contract, although, Allied did not execute a contract with the PCCA. Allied did, however, execute a performance bond with Fireman's Fund Insurance Company ("Fireman's Fund"), and Fireman's Fund became Allied's surety for the project.

On April 1, 1991 Dick retained a firm to serve as scheduling consultant. Dick then gave the schedule to Allied and the other subcontractors, and after several drafts and input from the various subcontractors, the initial schedule was issued by Dick on August 28, 1991. Work commenced on the project sometime thereafter.

At some point problems began to develop on the construction site and the project fell behind schedule. These problems apparently escalated, and in January 1993 Dick declared Allied to be in default and subsequently engaged another subcontractor to

---

1. The PCCA eventually assigned its rights under the contract to the City of Philadelphia and as a result the City of Philadelphia became the owner of the project.

2. Allied asserted other claims but these are the only counts that remain at this time.

3. These fourth-party defendants are Thompson, Ventulett, Stainback and Associates, Inc.; Vitetta Group Inc.; Pennell & Wiltberger, Inc. t/a/d/b/a PWI Engineering; and Philadelphia Design Collaborative.

complete the job. Allied then declared bankruptcy in June 1993 and remained in bankruptcy until April 1994.

After the bankruptcy proceedings ended, Allied filed this action against Dick, and Dick then asserted claims for indemnification against the PCCA.

## DISCUSSION

### I. *Summary Judgment Standard*

This Court is authorized to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any material factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The summary judgment standard requires the moving party to show that it is so one-sided that it should prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512. Nevertheless the non-moving party must raise more than a scintilla of evidence in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). Further, the non-moving party cannot survive a summary judgment motion by relying on unsupported assertions. *Id.*

### II. *Dick Enterprises's Motion for Summary Judgment*

#### A. *Count I—Breach of Contract*

Dick Enterprises argues that summary judgment should be granted in its favor on Allied's breach of contract claims because (a) Allied lacks standing to assert these claims because they were assigned to a third party, (b) Allied's claims are barred because Allied failed to comply with the Prime Contract's notice provisions, (c) Allied's claims are arbitrable and therefore non-justiciable in this forum, and (d) Allied's claim for sleeve-instal-

lation costs are barred because the contracts clearly require Allied to install sleeves.

Allied in turn argues that (a) it has standing to litigate these claims because it, *inter alia*, did not assign its rights under the contracts, and, in any event, it received ratification of this lawsuit from Fireman's Fund, its purported assignee, (b) Dick Enterprises breached the contracts by causing delays and failing to schedule the work in an orderly fashion, (c) Dick Enterprises waived its right to insist that Allied adhere to the Prime Contract's notice provisions when it breached the Subcontract, (d) Dick Enterprises delayed the arbitration proceeding even when Allied was willing to arbitrate, and Dick therefore waived its right to arbitration, (e) Allied was not responsible to install the sleeves, and Dick Enterprises' insistence that it do so was a breach of contract, and (f) Dick improperly withheld funds from Allied claiming that they were liquidated damages. Each of these arguments is addressed below.

#### 1. *Allied's Standing to Sue for Breach of Contract*

In sharp contrast to the vigor with which it argues for summary judgment on other grounds, Dick Enterprises devotes a couple of pages to claiming that Allied does not have standing to assert any claims against it in this action. Dick Enterprises argues that Allied assigned its rights under the contracts to Fireman's Fund in an indemnification agreement, and therefore that Fireman's Fund is the only party entitled to sue under the contract.

Allied responds by first denying that it assigned its claims to Fireman's Fund, and then by claiming that in any event, Fed. R.Civ.P. 17(a) allows for ratification by the real party in interest. Allied then claims that Fireman's Fund ratified Allied's commencement of this action in its settlement with Allied. *See* Pl's. Sur-reply Mem. in Supp. of Mot. in Opp. to Def.'s Mot. for Summ. Judg. Accordingly, Dick's argument fails. *See Hancotte v. Sears, Roebuck & Co.*, 93 F.R.D. 845 (E.D.Pa.1982) (ratification of lawsuit by party in interest permits suit to continue).[4]

4. In so ruling, we do not necessarily decide whether Allied assigned its claims to Fireman's

## 2. Change Order Requests (COR) [5]

### a. Notice Provisions

According to Dick Enterprises, Allied made Change Order Requests ("CORs") to its work but failed to comply with the notice provisions related to the CORs.[6] Specifically, Dick Enterprises claims that Allied refused to supply additional documentation when it was requested to do so in order that Dick Enterprises and PCCA could approve or reject Allied's CORs.

Allied responds by detailing all of its communication with Dick during the time that Dick was requesting additional documentation. Allied claims that it did not receive access to certain documents Dick possessed and that Allied needed these documents in order to detail its costs and submit such details to Dick. See Pl's. Mem. in Opp. to Def.'s Mot. for Summ. Judg. at 28–36. Allied then makes several legal arguments for this court to excuse its failure to comply with the notice provisions, namely, that (a) it was in bankruptcy from June 23, 1993 until April 14, 1994, and therefore it was not required to submit additional documentation during that time, and Dick Enterprises' attempts to void

Fund. Indeed, the language of the indemnification agreement between Allied and Fireman's Fund suggests otherwise. Paragraph Four of this agreement, *inter alia*, requires the surety to complete the contract in the event that Allied defaults. Paragraph 2 states, *inter alia*, that Allied will indemnify Firemen's Fund for its costs in complying with the bond. Paragraph 5, on which Dick Enterprises relies, states, *inter alia*, that Allied "assign[s], transfer[s], pledge[s], and convey[s] to the surety, . . . as collateral security, to secure the obligations hereunder . . . all of their rights under the contracts . . . and all actions, causes of actions, claims and demands [Allied] may have in anyway [sic] arising out of or relating to such Bond, or contract covered by [the bond]." Apparently, Fireman's Fund insured Allied's performance on the project and was obligated to complete the project if Allied defaulted. But Fireman's Fund had the right to sue Allied for its costs incurred thereto and also had a security interest in Allied's claims against Dick. Nothing in the contract suggests that Fireman's Fund was Allied's assignee and would replace Allied under its contract with Dick, such that Fireman's Fund was obligated to pursue Allied's claims against Dick.

In any event, Allied obtained ratification from Firemen's Fund, presumably because it and Firemen's Fund settled the claims between them, and Firemen's Fund would no longer need to assert Allied's pending claims against Dick pursuant to its security interest. Because this ratification exists, Dick's argument fails.

5. A change order is a written order to the general contractor authorizing a change in the work to be performed under the contract or an adjustment in the contract sum or contract time. A COR is a document requesting a change order and describing the circumstances requiring the change order, including the costs associated with the change. A disputed change order results when the parties do not agree that a change is being made. A unilateral change order is one in which the parties agree that a change is being made but do not agree on the cost and/or price adjustments. *See generally* Article 1, General Conditions, Prime Contract. Nevertheless, we use the acronym COR to refer to all types of change orders and change order requests.

Apparently, Allied made some CORs that were resolved before this lawsuit, specifically CORs 843, 911, 935. We will therefore refrain from discussing them.

Finally, we must mention that we are unable to determine whether individual CORs refer to sleeve claims, costs associated with delays, costs associated with scheduling, or any other claim. For example, we know that COR 356 apparently involves sprinkler modifications. We do not know whether the sprinkler modification claim arises because Allied had to insert sleeves that it felt it was not obligated to insert, or because Mr. Northcott or Dick changed specifications or drawings with respect to that sprinkler, or because of additional reasons. We are therefore unable to designate by number which CORs are viable after these summary judgment motions. All we can do is state generally which of Allied's claims or theories will remain.

6. Article 7 of the Subcontract provides that the determination of any COR by the Owner as provided in the Prime Contract between the Owner and the General Contractor is binding on the Subcontractor and the General Contractor. Furthermore, Article 22 of the Subcontract requires Allied to follow the procedures set forth in the Prime Contract for claims. Article 22 also provides that a failure to give notice in conformance with the Prime Contract will bar the Subcontractor in the same manner as set forth in the Prime Contract.

Article 53, Part A of the Prime Contract provides that the contractor has the duty to furnish such further information as the PCCA may require to resolve change orders. Part B of this Article provides that a final decision will be made by the PCCA after the last of the information which it requires is provided. Further, the rendering of such a decision is a condition precedent to either party exercising rights or remedies under the contract documents in law or equity. Therefore, in failing to supply the requested documentation, Allied did not comply with Article 53.

any CORs during that time were in violation of the Bankruptcy Code's automatic stay, (b) there is a factual dispute as to whether the notice provisions were modified, (c) Dick Enterprises and the PCCA waived the notice provisions, (d) Dick Enterprises and the PCCA had actual notice of all events and conditions that form the basis of Allied's claims, (e) strict compliance by Allied would have been futile, and (f) neither Dick Enterprises nor the PCCA suffered any prejudice since they had written notice of the delay.

■ With regard to Allied's arguments about the automatic stay, we note that section 362 of the Bankruptcy Code generally acts to shield the debtor from actions of its creditors and third parties so that the bankruptcy estate is not impaired while the debtor seeks relief from the bankruptcy court.[7] Section 365 of the Bankruptcy Code allows the trustee of the bankrupt estate to decide whether it will accept or reject executory contracts.[8] An executory contract that is neither accepted or rejected is not assumed to have been accepted, because acceptance requires court approval. *In re University Medical Center*, 973 F.2d 1065, 1077 (3d Cir. 1992). In addition, during the period in which the debtor has neither accepted nor rejected the contract, the terms of the contract are temporarily unenforceable against the debtor. *Id.* at 1075.

However, section 365(d)(2) provides that a creditor may petition the court to compel the trustee to either assume or reject the contract within a specified time.[9] Since Dick Enterprises did not petition the court, and Allied did not expressly accept or reject the contract, the contract passed through the

bankruptcy, *In re Polysat, Inc.*, 152 B.R. 886 (Bkrtcy.E.D.Pa.1993); *In re Linda Day, et al.*, 208 B.R. 358 (Bkrtcy.E.D.Pa.1997), and Allied was not required to comply with the notice provisions during bankruptcy. Furthermore, Dick Enterprises's decisions on Allied's change order requests were ineffective during the automatic stay. *See e.g., In re Beverage Enterprises Inc.*, No. 97–13534DAS, 1997 WL 177352, at *2 (Bkrtcy.E.D.Pa. April 7, 1997) (implying that even non-debtors actions vis-a-vis debtor could violate automatic stay since court held that when non-debtor violated notice provisions of contract with debtor and such violations occurred pre-petition, court had to lift stay to permit non-debtor to comply with notice provision).

Furthermore, we note that contrary to Dick's assertion, it is unclear that Fireman's Fund was responsible for pursuing Allied's CORs and attempts to receive additional funds from Dick, and therefore the failure of Fireman's Fund to comply with the notice provisions when Allied was in bankruptcy is irrelevant. Moreover, the notice provisions were not incorporated in the indemnity agreement or performance bond between Allied and Fireman's Fund, and the parties have not pointed us to any language in either the Subcontract or the Prime Contract that requires Allied to ensure that its surety would pursue its claims against the contractor. *See e.g., Van Cor, Inc. v. American Casualty Co.*, 417 Pa. 408, 208 A.2d 267 (1965); *Lite-Air Products, Inc. v. Fidelity & Deposit Co. of Maryland et al.*, 437 F.Supp. 801 (E.D.Pa.1977) (holding that surety's obligations depend on bond language). Addi-

---

**7.** Section 362(a)(1) provides as follows:

"a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of

"(a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1) (West 1993 & Supp.1997).

**8.** Section 365(a) provides:

"the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

**9.** Section 365(d)(2) provides:

In a case under chapter 9, 11, 12 or 13 of this title, the trustee may assume or reject an executory contract ... of the debtor at any time before the confirmation of a plan but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease. 11 U.S.C. § 365(d)(2).

tionally, it is unclear that Fireman's Fund could assert claims on behalf of Allied without violating the bankruptcy principles delineated above.

■ Nevertheless, we note there is at least one COR for which Dick requested documentation and for which Allied allegedly did not comply, even though Dick's request was made after Allied came out of bankruptcy. COR 717 was filed before Allied went into bankruptcy, but it was not until Allied came out of bankruptcy that Dick requested documentation. Allied therefore cannot use its bankruptcy as a defense. Thus, we will determine whether Allied was responsible for adhering to the notice provisions post-bankruptcy.

Initially, we note that Allied fails to address the argument that even if Dick Enterprises had actual notice that Allied was pursuing claims against it, the purpose of the provision was to ensure that Dick Enterprises and the PCCA had all the relevant information to assess Allied's entitlement to additional funds. Moreover, the fact that Dick Enterprises and the PCCA may eventually have rejected Allied's claims does not explain Allied's failure to follow contractual provisions. In fact, the main case that Allied cites for the proposition that prejudice must be shown before notice provisions will be enforced is inapplicable. In *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977), the court held that the insured could sue his automobile insurance company even after failing to give notice within the time period required under the insurance contract unless the insurance company could show prejudice, but the court noted that this insurance contract was "not a negotiated agreement." *Id.*, 371 A.2d at 196. More importantly, the court noted that its prior cases dealing with insurance contracts had applied a "strict con-

tractual approach" because "courts should not presume to interfere with the freedom of private contracts." *Id.*

In addition, at least one court has strictly construed contractual provisions governing claims disputes, even though there was evidence that the defendant was aware of the dispute. In *Envirex, Inc. v. Ecological Recovery Associates, Inc.*, 454 F.Supp. 1329, 1338 (M.D.Pa.1978), the parties had a contract which required Envirex to supply and service equipment. The court held that a provision in the contract requiring written approval for repairs could be strictly enforced. In discussing the provision which required ERA, the buyer, to provide notice to Envirex before Envirex would be required to perform repairs, the court stated:

> [E]ven assuming that it was aware of the repairs, however, it was perfectly reasonable for Envirex to remain silent under the circumstances. ERA had an obligation under the contract to file a satisfactory proof of claim with Envirex and was aware of the fact that Envirex was not liable for any repairs unless they were authorized in writing. Envirex was under no duty to warn ERA that it would enforce the contractual provisions if ERA failed to make satisfactory proof of the claim or obtain written authorization for repairs in writing from Envirex before undertaking repairs and its reliance on [the contracts' provisions] does not amount to fraud.

*Id.* at 1338.[10]

Accordingly, we are unpersuaded by Allied's attempt to convince us to ignore the notice provisions. However, as we noted above, there is a factual dispute as to whether Allied failed to comply with the notice provisions, because Allied was not receiving the documents it requested from Dick; this

10. The court also noted that the repairs were done for ERA's benefit, and not Envirex's, and the court pointed out that this made the case distinguishable from a situation in which the party seeking to rely on the notice provisions received the benefit of the repairs, yet now wanted to bar recovery by relying on the provisions. Since the benefit of the extra work went to Dick and Dick is the party relying on the notice provisions to bar recovery, it seems at first glance that *Envirex* points the other way, that is, towards

rejecting Dick's argument. Nevertheless, *Envirex* is still instructive, because in *Envirex* the court did not allow Envirex's silence to bar it from raising the notice provisions as a defense. In our case, Dick was not silent; instead, Dick insisted that Allied submit additional documentation in order to comply with the notice provisions. Therefore, if Allied failed to do so, and Dick was not responsible for Allied's failure in that regard, Allied will be barred from pursuing these claims.

dispute must be resolved at trial. Nonetheless, we are able to state that if the evidence does not show that Dick in any way impeded Allied's ability to comply with the provisions, any CORs on which Dick requested additional documentation after Allied's bankruptcy are waived as a result of Allied's failure to follow the notice provisions.[11]

b. *Arbitration Provisions* [12]

■ Dick Enterprises argues that Allied was obligated to submit its claims to arbitration. Allied responds by arguing that Dick Enterprises waived its right to arbitration by raising this argument after discovery had taken place and after Allied repeatedly requested Dick Enterprises to inform it of the steps to be taken with regard to initiating an arbitration.

We agree with Allied and find *Goral v. Fox Ridge, Inc.*, 453 Pa.Super. 316, 683 A.2d 931 (1996), instructive. In *Goral*, the defendants asserted as a defense to the plaintiff's claims that the contract contained an arbitration clause. Defendants raised this issue in their answer, a relatively early stage in the litigation. Defendants also asserted other defenses to the complaint but failed to suggest that these additional defenses should be submitted for arbitration. Defendants then received discovery requests from plaintiff, and defendants objected to these requests, again claiming that the dispute should be submitted for arbitration. Considering all of this, the *Goral* court nevertheless noted that it took nineteen months before the defendants sought to compel arbitration and that such a delay made it unjust to require that the case be submitted to arbitration.

Dick initially raised the arbitration issue in its motion to dismiss, and we refused to stay the case pending an arbitration. Instead, we ordered the parties to pursue the arbitration concurrently with the litigation of this case, and we also invited them to resubmit the issue of which claims should be arbitrated since they had failed to brief this issue thoroughly. *See Allied Fire & Safety v. Dick Enterprises, et al.*, 886 F.Supp. 491 (E.D.Pa. 1995). Dick Enterprises, like the *Goral* defendants, did not seek to compel arbitration, even after the parties voluntarily allowed this action to be stayed for six months pending settlement negotiations. Instead, Dick waited until this case had been on our docket for approximately four years, and now, at the summary judgment stage, seeks to raise this

---

11. Allied also misconstrues several cases in its arguments to persuade this court to ignore the notice provisions. First, Allied cites *Penn–Jersey Contractors, Inc. v. Com. General State Authority*, 12 Pa.Cmwlth. 203, 315 A.2d 920 (1973), for the proposition that Pennsylvania courts have abrogated notice provisions that require detailed statements of the claim within a specified time. Allied misreads this case. The court in *Penn–Jersey* merely stated that the contractor in that case could not have complied with the notice provisions by providing a detailed statement. The court explicitly stated that it made such a determination based on the record. *Id.*, 315 A.2d at 923. Allied has claimed that it could not have complied with the notice provisions because of Dick's interference and we will allow Allied to prove that at trial, but we do not have sufficient evidence in the record before us to rule definitively that Allied could not have complied with the notice provisions.

Second, Allied cites *Exton Drive-In, Inc. v. Home Indemnity*, 436 Pa. 480, 261 A.2d 319 (1969), but fails to mention that the court in *Exton* noted that the owner could not enforce the notice provisions because the provisions required an architect's order and the owner had failed to hire an architect. *Id.*, 261 A.2d at 325.

Third, Allied cites *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324 (3d Cir.1980), but in this case the court held that the large number of revisions to the drawings and the pace at which the plaintiff had to perform did not afford it time to compute costs and submit them to defendant. Furthermore, the plaintiff had brought the problem of complying with the claims procedure to defendant's attention while the construction on the project was ongoing and had written defendant, claiming that if defendant did not respond, plaintiff would assume that defendant agreed to waive the provision. Defendant then failed to respond to the letter. *Id.* at 329.

Finally, Allied cites *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968). In *Universal* the court noted that defendant's agent had orally promised to pay for the extra work, and therefore the written claims were unnecessary. *Id.* 244 A.2d at 15. Such is not the case here.

12. Article 54E of the Prime Contract provides for arbitration of change order disputes if the claim is under $250,000. This Article also prohibits combining disputes in order to establish a monetary claim higher than the $250,000 limit. In addition, Article 7 of the Subcontract expressly incorporates Article 54 of the Prime Contract.

issue in an attempt to further prolong this action.[13]

Most notably, Dick Enterprises does not even deny Allied's claim that it, Allied, sought Dick Enterprises's assistance in submitting this matter to arbitration. Instead, Dick argues, rather disingenuously, that it was not required to compel Allied to fulfil its contractual obligation to arbitrate. Accordingly, Dick's request to stay this action will be denied, and we need not determine which claims are encompassed within the arbitration clause, since we will not stay this action pending arbitration.[14]

### c. Sleeve Claims

■ Allied argues that it is not responsible for the costs it incurred in installing the sleeves.[15] According to Allied, the subcontract only requires it to supply the sleeves to Dick Enterprises. Dick Enterprises was then required to install them. Nevertheless, Allied claims that it was forced to install the sleeves after the walls were built, thereby incurring additional costs.

Not surprisingly, Dick Enterprises argues that the subcontract requires Allied to install the sleeves, not merely supply them.[16] To support their contentions, both sides point to various Specifications in the Prime Contract that were incorporated by reference in the Subcontract.[17]

After carefully reviewing the Subcontract and Specifications, we determine that Allied was responsible for supplying and installing the sleeves. Specification § 15091 Part 3.1 requires Allied to "furnish the sleeves to the Contractor for General Construction...." Part 3.2 of the same specification requires Allied to "coordinate location and installation with the contractor for General Construction." Part 3.3. of this specification then sets forth Allied's duties "after the pipe has been installed and insulated where required...." Significantly, Specifications § 15500–1 and § 15541–2 of Parts 3.1(A), which Allied conveniently ignores, require the subcontractor to "install all products," and this section explicitly includes the sleeves from Specification § 15091 among the products to be installed. Furthermore, Article 21 of the Subcontract provides that Allied is to "provide all embedded items and coordination for concrete work related to the scope of the work included herein," Subcon-

---

**13.** We concede that Dick Enterprises raised the issue of arbitration even earlier than the defendants in *Goral*. Dick raised the arbitration issue in its motion to dismiss, and the defendants in *Goral* did not raise the issue in their preliminary objections, (which is the state law equivalent, for our purposes, to a motion to dismiss); instead, the *Goral* defendants waited to assert this claim in their answer. This is the only difference between this case and *Goral*, though, and it is minor.

**14.** Neither party has raised the issue of whether the Federal Arbitration Act is applicable, and we do not have enough information to determine whether it is. *See e.g., Merritt–Chapman & Scott Corp. v. Pennsylvania Turnpike Com.*, 387 F.2d 768 (3d Cir.1967) (court will not speculate as to whether contract involved interstate commerce sufficient to bring it within the Act); *Litton RCS, Inc. v. Pennsylvania Turnpike Commission*, 376 F.Supp. 579 (E.D.Pa.1974) (determining whether contract falls under Act depends, *inter alia*, on whether parties contemplated substantial interstate activity). Nevertheless, we find that even if the Act were applicable, defendants waived their rights. *Eagle Traffic Control v. James Julian*, 945 F.Supp. 834, 835 (E.D.Pa.1996).

**15.** A sleeve is a tube of metal or plastic that is placed around a pipe where it penetrates a wall or a floor. Def.'s Mot. for Summ. J. at 59.

Sleeves can be installed in three main ways: (a) by hanging the pipe and then putting the sleeve around the pipe, and then building the wall around the pipe; (b) by installing a sleeve in the wall as the wall is being built, so that the pipe can be inserted at a later time; or (c) by installing the sleeve after the wall has been built. *Id.* This third method is the one that Allied used.

**16.** Throughout its memoranda, Dick Enterprises argues that there are numerous problems with Allied's calculation of damages, especially with respect to the sleeve installation claims. Nevertheless, Dick Enterprises also notes that such claims are not to be resolved in a summary judgment motion and states that it is not pursuing them at this time. We therefore refrain from addressing damages issues in this memorandum.

**17.** The specifications of the Prime Contract that were incorporated into the Subcontract are the Pennsylvania Convention Center Contract Documents for Exhibition Building, Division 15 "Mechanical Plumbing and Fire Protection," and Division 16 "Electrical, General Issue," dated October 4, 1990. Nevertheless, our discussion in this section deals with the Mechanical Specifications.

tract, Art. 1 ¶ 21, suggesting that Allied was to install sleeves and coordinate the concrete work, such as the building of walls, with its installation of the sleeves.

Most importantly, Allied argues that if the project had been completed in the correct order, it would not have had to break through the walls to install the sleeves; instead, it could have put the sleeves on the pipes and then have the walls built around them, and no one would have had to install the sleeves through the walls. Pl.'s Mem. in Opp. to Dick Enterprises's Summ. Judg. Mot. at 71. Yet, if Allied had put the sleeves on the pipe, Allied would have installed the sleeves, since, as Allied admits, one method of sleeve-installation involves placing the sleeve on the pipe and then building the wall around it. See Pl.'s Mem. in Opp. to Def. Mot. for Summ. Judg at 59. Thus, Allied admits that if the project were performed in the correct order, Allied would have put the sleeves on the pipes and then the walls would have been built around them, and thus by definition Allied would have installed the sleeves.[18]

Indeed, it appears that the crux of Allied's argument is not that it was not responsible for installing the sleeves, but that it was only responsible for installing the sleeves before the walls were built; if the walls were built first, then Allied was not required to install the sleeves. Unfortunately, Allied has not pointed to any part of the contract documents that evidence such a reading. Accordingly, we find that Allied was required to install the sleeves.[19]

d. *Scheduling, Delay and Coordination Problems*

According to Allied, Dick Enterprises altered the approved schedule's order without Allied's notification or consent, and this modification caused Allied to expend additional funds in performing its duties because it was forced to perform its tasks out of sequence and in some cases to duplicate previously performed work. To illustrate its point, Allied claims that it was forced to perform some of its tasks after walls were erected. Presumably, this required Allied to penetrate the walls and then repair them after it had completed its tasks. This process caused Allied to incur more expense than it would have if it had been able to complete its tasks before the walls were built. Therefore, Allied concludes, it was denied reasonable access to its work areas because of Dick's failure to schedule and coordinate the work.

■ Dick argues that the affidavits of Allied's witnesses who attest to scheduling problems are contradicted by their deposition testimony which indicates that these witnesses do not have personal knowledge of the facts to which they attest. This evidence, Dick claims, is therefore inadmissible hearsay. For example, Dick Enterprises claims that Mr. Mohammed, Allied's Chief of Engineering, is not qualified to state whether Dick Enterprises followed the approved schedule since Mr. Mohammad admitted in his deposition that he never saw the schedule and was unfamiliar with it.

Nevertheless, we find that Mr. Mohammad's affidavit does not directly contradict his deposition statement since the affidavit merely states that Allied did not follow the schedule; it does not say that Mr. Mohammad was aware of the schedule's details before hand. Presumably, Mr. Mohammad could have looked at the schedule after his

---

**18.** In its brief, Allied actually states that *no one* would have had to install the sleeves if it had been able to place the sleeves on the pipes prior to the building of the walls. Pl's Mem. in Opp. to Def. Mot. for Summ. Judg. at 71. Nevertheless, as mentioned above, the explanation afforded to the court by the parties, suggests that placing the sleeves around the pipes prior to the construction of the wall is a method of sleeve-installation.

**19.** Allied also argues that Dick Enterprises and others working on the project installed sleeves, and therefore that Dick Enterprises' conduct evidences a realization that it was responsible for sleeve installation. Plaintiff then cites specific pages of the transcript of Mr. Mohammad and Mr. Newell. *See* Mohammad Tr. at 166, Newell Tr. at 702. Nevertheless, the circumstances surrounding Dick's decision to install that sleeve are unclear. In any event, Dick's decision to install one sleeve hardly constitutes convincing evidence that it was obligated to install all sleeves, especially since Allied seems to be suggesting that the total number of sleeves installed is rather large.

deposition and still state from personal knowledge that the schedule as reflected on paper does not reflect what actually occurred on-site as the work progressed. We will therefore proceed with analyzing Allied's claims under the contracts.

■ Allied argues that Dick Enterprises was responsible for scheduling and coordinating Allied's work pursuant to Articles 13–A and 13–B of the General and Supplementary Conditions of the Prime Contract. Allied also claims that Article 38 requires Dick Enterprises to prepare and monitor a schedule for work on the project.

Dick Enterprises responds by pointing to Article One, Paragraph 7 of the Subcontract which requires Allied to coordinate its work with that of other subcontractors. In addition, Article 28 of the Subcontract requires Allied to provide scheduling input so that Dick Enterprises may develop a schedule in accordance with Article 33 of the Prime Contract. Furthermore, Article One, Paragraph 4 of the Subcontract requires Allied to comply with Dick's scheduling requirements. In this way, Allied and Dick both pick selectively from the above mentioned provisions, in order to argue that the other party was responsible for coordination.

Unfortunately for Allied, since it claims that Dick breached this alleged duty, it bears the burden of proving that such a duty exists and that it is entitled to recovery. But Allied has brought to our attention only one case in which the failure to follow the sequence of the project was considered a breach of contract, and this case is distinguishable.

In *Bat Masonry Company, Inc. v. Pike–Paschen Joint Venture III,* 842 F.Supp. 174 (D.Md.1993), the court noted that an important issue would be whether the schedule was completed before the subcontract was executed. Presumably, the subcontractor could not have been relying on the schedule when it bid on the project if the schedule was created after the subcontract was executed. It was only after the court determined that the subcontract was executed after the schedules were set that the court allowed a claim for the delays. *Id.* at 176–77.

In this case, Allied has not explained why the schedule is to be considered a part of its subcontract with Dick Enterprises since it bid on the subcontract well before the schedule was set. *See* Pl.'s Mot. in Opp. to Def.'s Summ. Judg. Mot. at 6–9, 16–20. Allied bid on the project before knowing in what order the tasks would be done; all Allied could do was assume that the project would be conducted in a particular order, perhaps based on its past experience. Allied cannot explain why Dick Enterprises's scheduling and coordination duties imply that the schedule must reflect a particular order and, in particular, the order that Allied proposes. All Allied is left to argue, without much support, is that Dick Enterprise's scheduling and coordinating duties under the contracts mean that the sequence reflected in the initial schedule must be followed. Yet, the subcontract's provisions also require Allied to follow the order as prescribed by Dick. *See Lichter v. Mellon–Stuart Co.,* 193 F.Supp. 216, 219 (W.D.Pa.1961) (holding that contract provision which required the subcontractor to perform tasks as directed by contractor precluded recovery for damages caused by contractor's failure to follow schedule, even though subcontractor presented evidence, and court found, that contractor required performance of work in haphazard order in contravention of progress schedules). Accordingly, we find that Allied's claims for Dick Enterprises' alleged failure to schedule and coordinate the project must fail.

■ Allied also claims that Dick Enterprises is responsible for delays caused by Allied's inability to obtain approval for its shop drawings. According to Allied, Julian Northcott of PWI Engineering not only insisted on reviewing and approving shop drawings when PWI was not required to do so under the contracts, but also unreasonably withheld PWI's approval of these drawings. This resulted in delays which cost Allied significant sums of money.

Perhaps realizing that it is suing Dick Enterprises and that Mr. Northcott is a PWI representative, Allied then claims that Dick Enterprises' decision to tell Allied to comply with Mr. Northcott's requests means that Dick Enterprises acquiesced in PWI's deci-

sion to review the drawings. Allied then concludes that Dick can be held liable for the costs Allied incurred because of Mr. Northcott's request, since Dick in some way ratified PWI's conduct. Notably, Allied does not point to any case authority or contractual provision suggesting that Dick Enterprises can be held liable for the acts of PWI. In any event, we will analyze the contracts' provisions.

Article 2 of the subcontract provides that Allied may be entitled to extra time to complete its work if the delays are caused by another subcontractor. Additionally, Article 1 of the subcontract provides that the subcontractor can only look to Dick for a remedy if there is a dispute under the subcontract.

Accordingly, it would appear that Allied could only have received extra time to complete the work if PWI caused Allied's delays. We shall therefore consider Allied's argument that Dick caused the delays when it sanctioned PWI's conduct and ordered Allied to comply with Mr. Northcott's requests.

Initially, we note that no provision of the subcontract deals with Allied's claims for delay if the delays were caused by Dick. However, Article 30 of the Subcontract governs Allied's obligations with respect to drawings. This article requires Allied to submit drawings to Dick in conformance with Article 31 of the Prime Contract and § 4.04 of the Supplementary Conditions in the Prime Contract. In addition, Article 24(j) of the Subcontract provides that Allied will furnish additional drawings and documents if required by the contractor. Therefore, Allied was explicitly obligated to provide any drawings or additional documents that Dick may have required. Nevertheless, if Allied can show that Dick affirmatively interfered with Allied's performance of the contract, Allied can recover for the damages resulting from Dick's delay. *See e.g. Gasparini Excavating Co. v. Pennsylvania Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963) (holding that clause in contract precluding recovery for delay damages was inapplicable when Owner told contractor to begin work six months before site was ready because of work of another contractor, and Owner knew site was unavailable); *Grimme v. Mergentime Corp.,*

406 Pa.Super. 620, 595 A.2d 77, 82 (1991) (holding that exculpatory clause precluding recovery for delay cannot be used as defense if there was affirmative interference or failure to act in some essential matter necessary for prosecution of work); *but c.f. Johnson v. Fenestra Inc.,* 305 F.2d 179 (3d Cir.1962) (parties may validly provide that extension of time is the only remedy for circumstances causing delay); *Lichter,* 193 F.Supp. at 219 (holding that parties can validly provide in contract that general contractor is not liable to subcontractor for damages attributable to delay).

### e. *Liquidated Damages*

Article 3 of the Subcontract allows Dick to declare Allied in default if Allied, *inter alia,* fails to proceed with diligence while performing under the subcontract. Under this article, Dick can also arrange to have the job completed and then charge Allied for the cost of completion, plus a 10% mark-up.

Allied now claims that the amount of damages that Dick withheld was not liquidated damages since another provision of the subcontract deals with liquidated damages. Allied points to Article 32 of the Subcontract, which allows Dick to obtain liquidated damages if Allied is late in completing the job, and states that that provision is the only liquidated damages provision. Allied also claims that Dick did not ascertain its damages with any certainty, and therefore both the amount it charged Allied as actual damages, and the 10% markup, are based on conjecture and must be a penalty.

▮▮▮▮ With regard to Allied's claim that Article 32 is not a liquidated damages provision, Allied cites no authority for the proposition that there can only be one liquidated damages provision in a contract. While it is true that the language in Article 3 and in Article 32 should perhaps have both explicitly referred to the provisions as liquidated damages, we will not hold that there can only be one liquidated damages provision in a contract. *See also Commonwealth of Pennsylvania v. Musser Forests, Inc., et al.,* 394 Pa. 205, 146 A.2d 714, 716 (1958) (stating that the name by which clause is called not determi-

native as to whether it is a liquidated damages provision). Nevertheless, whether the liquidated damages provisions are actually penalties is a "mixed factual and legal question." *Holt's Cigar Co. v. 222 Liberty Assocs.*, 404 Pa.Super. 578, 591 A.2d 743, 748 (1991). The court must consider, *inter alia,* whether the stipulation was chosen because of difficulties in proving the certainty of damages that would be incurred and whether the stipulated sum was agreed to as a good faith pre-estimate of actual damages. *Id.* Accordingly, these issues will be addressed at trial.

### B. *Count II—Quasi–Contract Claims*

Dick Enterprises argues that there can be no recovery under a quasi-contract theory since all of the claims arise under the applicable contracts. According to Dick Enterprises, quasi-contract recovery is only allowable when (a) the express contract is rescinded, abandoned or replaced, or (b) the work performed was outside the scope of the contract. Dick Enterprises then argues that there is no evidence that the contracts were rescinded and that the work performed was not outside the scope of the contracts, and therefore the contracts' provisions would govern Allied's claims for extra work.

In contrast, Allied argues that there should be recovery based on a quasi-contract theory for several reasons. First, Allied argues that it is entitled to recovery under a quasi-contract theory because the work it performed was beyond the scope of the contract. Second, Allied claims that the extra costs and charges are due to delays Dick Enterprises caused, and the amount of recovery in such a case is not delineated in the contract. Third, Allied claims that the additional burdens it experienced because of Dick Enterprises's delays could not be anticipated or contemplated when the Subcontract was made, and therefore the Subcontract is

deemed rescinded and replaced by an implied-in-fact contract.

▮ Nevertheless, we have already determined, when discussing Allied's breach of contract claims, that the work performed was not beyond the scope of the contract since Allied was contractually responsible for installing the sleeves. Therefore, Allied's work did not confer a benefit on Dick Enterprises that was beyond the scope of the contract, and there can be no unjust enrichment claim. Indeed, it is not that Allied unjustly enriched Dick Enterprise; rather, it is that in performing the work it was obligated to perform, Allied incurred significant costs, because, *inter alia,* Dick Enterprise allegedly interfered with the schedule. Since this argument has been addressed in our breach of contract discussion, we need not repeat it here.

▮ We note, however, with respect to Allied's argument that an implied-in fact contract was made, that this type of contract only results if the parties' conduct evidences an agreement. *U.S. v. St. John's General Hospital,* 875 F.2d 1064, 1074 n. 8 (3d Cir. 1989) (explaining that quasi-contract is based on unjust enrichment while implied contract presupposes an implied agreement between the parties). Nothing in this case suggests that Dick Enterprises agreed to reimburse Allied for the extra expenses that Allied incurred; to the contrary, Allied's claim is precisely the opposite—that Dick Enterprises forced it to install sleeves and perform work that Allied felt it was not obligated to perform over Allied's objections. We therefore cannot imply an agreement between Allied and Dick Enterprises for Dick Enterprises to pay Allied for this "extra work," when the facts as presented by both parties show that there was an ongoing dispute as to whether payment was appropriate. Accordingly, Allied's claims for recovery under an implied-in-fact contract or under a quasi-contract theory fail.[20]

---

**20.** Allied makes an additional claim which we find meritless. Allied claims that it is pursuing a cardinal change theory. According to the cardinal change theory, a contractor can make a claim against the government when the government effects a change so drastic that the contract cannot be equitably adjusted. *See Weston v. Hal-*

*liburton,* No. Civ.A. 91–1133, 1993 WL 57182, at *2 (E.D.Pa. March 3, 1993). Notably, Allied cites a series of cases which involve the assertion of the cardinal change theory against the federal government, not a state municipality. Allied does not explicitly address the issue of whether this theory applies to the contracts at issue in this

## C. Count III—Negligence

Dick Enterprises argues that this count should be dismissed because (a) all of Allied's claims are contractual and there is no tort recovery for negligent breach of contract, and (b) the economic loss rule bars Allied from recovering in tort for losses that are purely economic in nature. Allied argues that Dick Enterprises affirmatively interfered with Allied's ability to perform its duties under the contracts, and therefore, that it is entitled to proceed with its tort causes of action. Allied also argues that the economic loss rule is inapplicable because it does not apply to services contracts.

### 1. Negligent Breach of Contract

Initially, we note that there are two lines of cases that address whether a cause of action is primarily in tort or in contract. The first line of cases uses a test that is commonly referred to as the "gist of the action test," *see Bash v. Bell,* 411 Pa.Super. 347, 601 A.2d 825 (1992), and it requires the court to determine whether the wrong ascribed to defendant is essentially a tort with the existence of the contract being collateral, or whether the action is truly one that concerns the parties' contractual rights.

In *Bash,* the plaintiffs sued a telephone company for its failure to include the customer's advertisement in a telephone directory, pursuant to their contract. The court found that the "obligations of the parties . . . [were] a matter of private contract law," *id.,* 601 A.2d at 829, and therefore that there could be no cause of action in negligence.

The second line of cases requires the court to determine whether there was an improper performance of a contractual obligation (misfeasance) which would be characterized as a

tort claim, or whether there was a failure to perform (nonfeasance) which would be characterized as a contract claim. *See Raab v. Keystone Ins. Co.,* 271 Pa.Super. 185, 412 A.2d 638 (1979). In *Raab,* the plaintiffs sued their insurance company after the company first began paying benefits under their policy and then suspended the payments. Plaintiffs alleged that the company failed to properly administer their insurance business and thereby negligently failing to handle plaintiffs' claim. The court, noting that the plaintiffs' claim was based on defendant's failure to take certain actions in handling the claim, held that there could be no cause of action in negligence because the claim was for nonfeasance. *Id.,* 412 A.2d at 639.

Nevertheless, the Supreme Court of Pennsylvania has not addressed this issue, and the Superior Court of Pennsylvania and the federal courts in Pennsylvania have applied *Raab* and *Bell* without a clear pattern.

Some cases have strictly followed *Raab. See e.g., Fink v. Delaware Valley HMO,* 417 Pa.Super. 287, 612 A.2d 485 (1992) (claims against HMO for failure to treat, obtain informed consent, or supervise doctors and medical staff, and for permitting non-medically licensed employees to override doctors' opinions amount to misfeasance); *Grode v. Mutual Fire Marine, and Inland, Ins. Co.,* 154 Pa.Cmwlth. 366, 623 A.2d 933 (1993) (insurance company's claim for mishandling claims against contractor hired to provide administrative services could proceed in tort because it alleged misfeasance); *Hirsch v. Mount Carmel,* 363 Pa.Super. 433, 526 A.2d 422, 425 (1987) (defendant's failure to complete financing agreement in timely fashion which caused plaintiff loss under prior agreement was misfeasance and supported tort claim).

---

lawsuit, but seems to assume that it does. In any event, we determine that even if the cardinal change theory can be applied here, Allied cannot assert it in this action.

We have already held that Allied was responsible for sleeve-installation and therefore that claim cannot be the basis of a cardinal change theory. Nevertheless, Allied also claims that there were delays in obtaining approval for its drawings and that it had to resubmit its drawings many times because approval was unreasonably withheld, and also that there were delays in the

schedule. Allied then points to the costs it incurred and then erroneously claims that this amounts to a cardinal change. *See* Pl.'s Surreply Mem. in Supp. of Mot. in Opp. to Def.'s Summ. Judg. Mot. at 15. Yet, Allied never suggested that the drawings that were eventually accepted were for a completely different set of plans and specifications, and Allied must show this in order to pursue a cardinal change theory. *See Wunderlich Contracting Co. v. U.S.,* 240 F.2d 201, 203 (10th Cir.1957). Accordingly, Allied's arguments in this regard are to no avail.

Yet recent cases have explicitly expressed the view that the *Raab* line of reasoning is inadequate. *See e.g. Phico Ins. Co. v. Presbyterian Medical Servs. Corp.*, 444 Pa.Super. 221, 663 A.2d 753 (1995) (holding that various acts of mismanagement stated a contract claim as opposed to a tort claim, and concluding that although the *Raab* decision "set forth a bright and easily discernable line for considering the nature of a claim, it is not difficult to imagine many agreement-based complaints which may be characterized as sounding in tort when they more properly should be seen as contractual"); *Redevelopment Authority of Cambria County v. International Ins. Co.*, 454 Pa.Super. 374, 685 A.2d 581 (1996) (failure of Redevelopment Authority to comply with water standards and to deliver potable water were contractual claims under contract between parties to operate water system); *Ingersoll–Rand Equipment Corp. v. Transportation Ins. Co.*, 963 F.Supp. 452 (M.D.Pa.1997) (court repudiates *Raab* misfeasance/nonfeasance distinction and holds that insurer's counsel's failure to adequately defend insured in underlying litigation asserts a breach of contract claim, not negligence); *New Chemic (U.S.), Inc. v. Fine Grinding Corp.*, 948 F.Supp. 17 (E.D.Pa. 1996) (holding that misfeasance/nonfeasance reasoning has been abandoned and refusing to apply it to manufacturer's suit against contractor for failure to adhere to FDA standards when hired to perform micronization process on pharmaceutical). *Sun Co., Inc. v. Badger Design & Constructors*, 939 F.Supp. 365, 373 (E.D.Pa.1996) (holding that claim against engineering/management/construction team for design errors were contract claims rather than tort claims because defendant's duties came from contract, complaint alleged only economic damages, contract disclaimed tort liability, and public policy warranted application of the economic loss rule).

Allied argues that we should apply the *Raab* rationale because (a) the gist of the action test has been used less frequently and (b) Dick's misfeasance consisted of (1) permitting subcontractors to deviate from the approved schedule and (2) insisting on reviewing and approving shop drawings after they were already approved by the entity charged with doing so under the contracts.

Dick Enterprises argues that we should adopt the gist of the action test, and hold that Allied's claims are essentially contract claims governed by the Prime and Sub–Contracts. Adopting its arguments mainly from *Roy F. Weston, Inc. v. Halliburton NUS Environmental Corp.*, 839 F.Supp. 1151 (E.D.Pa.1993), which applied the gist of the action test, Dick Enterprises argues that the duties that were imposed on it stem from the contract and therefore demonstrate that Allied's underlying claims are essentially contractual claims. Furthermore, Dick Enterprises argues, the damages that Allied seeks all stem from the contract, and therefore Allied's negligence claims are basically a restatement of the breach of contract claims. *See e.g., Weston*, 839 F.Supp. at 1155 (fact that damages were based solely on contract was additional reason to hold that claims were based on contract rather than tort claims).

■ After carefully considering the various cases on the issue, we find the gist of the action test more persuasive in this case for two main reasons. First, we note that the Pennsylvania Superior Court has recently undermined the *Raab* decision in *Phico* and *Redevelopment* by pointing out that *Raab* may not have much authority as precedent since it was not decided by a unanimous three judge panel. These cases have also stated that *Raab's* rationale may not always be appropriate to analyzing whether the cause of action is in tort or contract. Second, we note that the majority of cases that concern complex contracts and in particular construction contracts, negotiated by sophisticated parties, have applied the gist of the action test.

## 2. The Economic Loss Rule

■ Dick Enterprises also argues that the economic loss rule, first enunciated in *East River Steamship Corp., v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), bars recovery for economic loss. In *East River* the court applied the economic loss rule in a products liability action to bar recovery for the destruction of a ship. The only damage

suffered was to the ship itself and the court held that contract law, and in particular warranty law, was well suited to commercial controversies. According to the court, there was "no reason to intrude into the parties' allocation of the risk." *Id.* at 873, 106 S.Ct. at 2303.

Allied argues that the economic loss doctrine has not been applied to services contracts, as opposed to product liability actions, and the economic loss doctrine's aim at protecting companies from unlimited tort liability is inapplicable to this case because Allied has not asked for punitive damages.

Nevertheless, we find that the economic loss rule has been applied to service contracts. *See Palco Linings, Inc. v. Pavex,* 755 F.Supp. 1269 (M.D.Pa.1990) (subcontractor's negligence action against architect/engineer barred by economic loss rule where duty to recover arose from agreements), *Sun Company,* 939 F.Supp. at 373 (economic loss rule does not apply only to product liability cases), *Charles Shaid of Pennsylvania, Inc. v. George Hyman Construction Co.,* 947 F.Supp. 844, 854 (E.D.Pa.1996) (no tort claim when contract between subcontractor and contractor provided basis for recovery). The rule has also been applied when the parties did not have a contractual relationship, *see General Public Utilities v. Glass Kitchens of Lancaster,* 374 Pa.Super. 203, 542 A.2d 567 (1988) (tourist industry could not recover against owners of nuclear power plant for economic loss arising from negligent nuclear accident that caused diminution in tourist industry).

Furthermore, the rationale of *East River* seems to apply here since the parties have entered into sophisticated agreements which allocate the parties' responsibilities in great detail. Accordingly, we hold that Allied's negligence claims are barred by the gist of the action test as laid out in *Bell* and by the economic loss rule.

### D. Count IV—Loss of Bonding Capacity

■■■■ Allied's claim for loss of bonding capacity is a claim for consequential damages. Allied contends that Dick's breach of the contracts resulted in Allied's inability to obtain bonding, which in turn led to Allied's inability to obtain construction jobs that required bonding. Allied then suffered a loss of profits because of the decline in its business.

Dick Enterprises argues that the lost bonding capacity damages are not recoverable because they are too speculative.

Nevertheless, we find that Allied can assert a claim for lost profits.[21] However, Allied must show that such damage was foreseeable by the parties at the time of contracting. *Fort Washington Resources, Inc. v. Tannen,* 901 F.Supp. 932, 943 (E.D.Pa.1995). Whether Allied has made a sufficient showing in this regard will be determined by the factfinder. *SHV Coal, Inc. v. Continental Grain Co.,* 376 Pa.Super. 241, 545 A.2d 917, 922 (1988). Accordingly, we will not grant summary judgment as to this claim.

### III. PCCA's Motion for Summary Judgment

There are two primary arguments made by the PCCA that we will address.[22] First, the PCCA argues that Allied's claims should be barred for failure to follow the notice provisions. Second, the PCCA argues that it and Dick entered into a release that settled all claims Dick may have against the PCCA resulting from Allied's lawsuit, and that Allied also released its claims against Dick. We will address both these arguments below.

---

**21.** Technically Allied should not have asserted the claim for loss of bonding capacity as a separate count since it is not separate from the breach of contract and negligence claims, but merely constitutes some of the damages that Allied seeks to recover.

**22.** The PCCA also makes arguments with respect to some of Allied's claims which we have already dismissed earlier in this memorandum. For example, the PCCA argues that it is not liable in negligence since it is a public body and is therefore entitled to sovereign immunity; but we have dismissed Allied's negligence claim. Accordingly, we need not address all the issues raised by the PCCA in its motion.

### 1. *Notice Provisions*

First, the PCCA claims that Allied failed to follow Article 49 of the Prime Contract, which requires Allied to submit claims within ten days of the events giving rise to the claims. According to the PCCA, Allied submitted a letter on February 12, 1993, and the claims associated with this letter were for events occurring in 1991. The PCCA also claims that Allied stated that it would supply additional documentation but did not do so for more than seventeen months.

 Nevertheless, we have already determined that Allied was not obligated to supply additional documentation when it was in bankruptcy, and that there is a factual issue as to whether Allied may have had difficulty supplying the documentation because of Dick's alleged interference. However, we have also held that Allied was required to adhere to the notice provisions when it was not in bankruptcy and not hindered by Dick. Accordingly, we hold that if Allied submitted claims before it went into bankruptcy, but the claims were for events occurring more than ten days prior to the submission of the claims, in violation of the notice provisions, those claims will be barred; however, this issue will be resolved at trial.

### 2. *Releases*

The PCCA claims that it entered into two releases with Dick and that these releases bar Dick from seeking indemnification from the PCCA for Allied's claims. The PCCA also claims that Allied accepted final payment in settlement of its claims and therefore this bars Allied from suing Dick.

With respect to the releases between it and Dick, the PCCA points to two documents, "Modification No. 1" and "Modification No. 2." Modification No. 1 was executed before Allied sued Dick but after Allied had apparently initiated some of its CORs. Modification No. 1 is apparently intended to release the PCCA from liability to Dick on all of Allied's claims except CORs 709D and 793D. Modification No. 2 was executed after

Allied initiated its lawsuit against Dick and expressly notes that CORs 709D, 793D and 473D are unresolved. Therefore, the PCCA claims, after Modification No.2, only these three CORs, and an unidentified COR for Allied's sleeve claim, remained unresolved.

Dick responds to these arguments by stating that Allied collapsed all its claims into CORs 709D and 793D when it sued Dick, and therefore the PCCA is required to indemnify Dick for all Allied's claims since Modification No. 2 expressly excludes CORs 709D and 793D. Dick also cites deposition testimony of its Project Manager who states that the PCCA was aware of what Allied had done. *See* First–Part Def.'s Mem. in Resp. to PCCA's Partial Summ. Judg. Mot. at 16.

 At first glance, it seems highly unlikely that the PCCA would first receive a release from Dick as to almost all of Allied's claims in Modification No. 1, and then knowingly re-assume the risk of liability as to those same claims in Modification No. 2, by assuming responsibility for a couple CORs in which Allied had subsequently collapsed previously released claims. Nevertheless, Dick does present testimony to this effect and it is possible that Dick refused to execute Modification No. 2 once it realized the magnitude of Allied's claims. The PCCA could then have agreed to Modification No. 2 so that it could at least settle other unresolved claims between it and Dick. Accordingly, we cannot construe the effect of the modifications as a matter of law and the PCCA cannot receive summary judgment on this ground.[23]

The PCCA also argues that Allied released all its claims when it accepted monthly progress payments. The monthly progress payments contained a waiver of all claims arising before the date of the payment and since Allied did not modify the releases, the PCCA argues that Allied has waived its claims "with the exception of outstanding change order requests." The problem with the PCCA's argument is that its exception swallows the rule it would have us follow; the very problem is that none of the parties agree on which CORs were submitted before or after

---

**23.** Since the parties cannot even determine which CORs refer to which claims, it is not surprising that this court had to state earlier in this memorandum that we are unable to state which CORs are still viable after the resolution of these motions. See supra, at n. 4.

**940**

January 22, 1993, and which CORs were outstanding at which time. Accordingly, we cannot determine which claims Allied allegedly waived. We must therefore deny the PCCA's motion for summary judgment.

*IV. Conclusion*

We have dismissed Allied's quasi-contract and negligence claims but the breach of contract and loss of bonding capacity claims remain.

With regard to Allied's breach of contract claims, we hold that Dick is not liable for Allied's sleeve installation costs, nor Allied's damages caused by Dick's failure to follow the schedule. Nevertheless, Allied may pursue claims for the delays caused by Dick's insistence that it submit additional drawings to PWI, if such insistence was an affirmative interference with the contract. Allied may also pursue its claims that Dick improperly received liquidated damages. However, in order to proceed with its breach of contract claims, Allied must show that it complied with the notice provisions, unless it was hindered in doing so by Dick, or was in bankruptcy at the time it was required to submit additional documentation.

With regard to Allied's loss of bonding capacity claim, we hold that Allied can assert this claim if it can show that these consequential damages resulted from the breach of the contract claims that have not been dismissed.

Finally, we hold that the PCCA is not entitled to summary judgment based on the releases it executed with Dick or the progress payments Allied accepted, since there are factual issues with regard to the scope of the releases and which CORs were outstanding at the time Allied accepted the progress payments.

An appropriate Order follows.

### ORDER

AND NOW, this 22nd day of August, 1997, upon consideration of Defendant Dick Enterprises, Inc.'s Motion for Summary Judgment, (Document #.76) and all the submissions of the parties thereto, it is hereby ORDERED as follows:

1. Count I of Allied Fire and Safety Equipment Company's Complaint is limited to Plaintiff's claim for delay damages and improperly withheld liquidated damages.

2. Counts II and III of Plaintiff's Complaint are DISMISSED.

FURTHER, upon consideration of the Third–Party Defendant, the Pennsylvania Convention Center Authority's Motion for Summary Judgment, and all the submissions of the parties thereto, said motion is hereby DENIED.